IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 25, 2023 Session

**STATE OF TENNESSEE v. ROGER EARL ENGLAND**

**Appeal from the Criminal Court for Knox County**
**No. 117643   Kyle A. Hixson, Judge**
_____

**No. E2022-01392-CCA-R3-CD**
_____

Defendant, Roger Earl England, appeals as of right from his conviction for first degree premeditated murder, for which he is serving a life sentence. On appeal, Defendant contends that (1) the evidence of premeditation is insufficient to support his conviction; (2) the trial court erred by admitting Defendant's jail telephone calls and emails, which alerted the jury to Defendant's pretrial incarceration; (3) the prosecutor made improper statements during the State's closing and rebuttal arguments; (4) the trial court erred by instructing the jury that destruction of evidence could be considered evidence of guilt only as to the charged offense of first degree murder and by declining to instruct the jury on voluntary manslaughter as a lesser-included offense; and (5) the cumulative effect of these errors entitles him to a new trial. After a thorough review of the evidence and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and MATTHEW J. WILSON, JJ., joined.

Eric M. Lutton, District Public Defender; and Jonathan Harwell (on appeal), Christy A. Murray and Jackson Whetsel (at trial), Assistant District Public Defenders, for the appellant, Roger Earl England.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel S. Lambert and Hector Sanchez, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

This case arises from the shooting death of twenty-five-year-old Kelsey Polk (the victim), which occurred in the early morning hours of January 26, 2020. On July 1, 2020, the Knox County Grand Jury charged Defendant with first degree premeditated murder. The proof at trial established that Defendant, who was thirty-three years old at the time, was married with three children and owned a trucking company in Harriman when he met the victim in December 2019, at a club in Indiana. After a "whirlwind" romance of a few weeks, Defendant moved with the victim into a rental house on Missoula Way in Knoxville in mid-January 2020. At trial, Defendant conceded that he shot the victim, and the main issue was premeditation.

### A. Testimony from the victim's and Defendant's friends and family

Wendy Polk testified that she was the victim's mother and that the victim decided to move to Tennessee around January 17, 2020. Ms. Polk said that, in the early morning hours of January 26, the victim called her but that she did not pick up the telephone in time. Ms. Polk tried unsuccessfully to call the victim back. Around 12:25 a.m., the victim called again and told Ms. Polk that she was sorry for waking her and that "everything was ok now." The victim stated that she was fine and that she loved Ms. Polk. Ms. Polk asked the victim if she was sure that everything was okay, and the victim responded that everything was fine, that she loved Ms. Polk, and that she would talk to her tomorrow. The call was the last time the victim and Ms. Polk spoke. Ms. Polk stated that she did not hear anyone or anything in the background of the call.

On cross-examination, Ms. Polk testified that the victim made friends easily, that she was friendly to everyone, and that the victim was loved. She agreed that the victim was a spontaneous "free bird" who loved "completely." Ms. Polk stated that she and the victim had a close relationship, that the victim called and texted her often, and that she knew a lot about the victim's life. She said that the victim used an application called "Life360," which the victim used to share her location with family and friends. Ms. Polk identified a printout from Life360, which showed the victim's photograph superimposed on a map of the Knoxville area.

Ms. Polk testified that the victim was employed as a dancer at the club where the victim met Defendant. Ms. Polk agreed that the victim was living "a bit of a party lifestyle." Ms. Polk said that the victim was living with a boyfriend but that she did not know the victim and her boyfriend were "unstable" until the victim decided to leave him for Defendant. According to Ms. Polk, the victim thought Defendant would provide her with stability, and the victim was happy that Defendant owned a business and was going

to "get her a home." She stated that the victim was excited about the prospect of a change and about the relationship. Ms. Polk said that the victim and Defendant were making plans for future trips together and that the victim mentioned wanting to take community college classes. Ms. Polk said that the victim and Defendant spent a lot of time together over a few weeks and that the victim began going on trucking runs with Defendant. Ms. Polk identified photographs of the victim and Defendant while they were furniture shopping. Ms. Polk stated that the victim was excited to meet Defendant's children and planned to buy them gifts. Ms. Polk testified that the victim introduced Defendant to her best friend, Dylan Jack, and that the meeting went well.

On redirect examination, Ms. Polk testified that the victim expressed concerns about the victim's relationship with Defendant. She stated that Defendant had told the victim his name was "Noah" and that the victim had been under the impression that Defendant was separated from his wife and going through a divorce. During their drive to Tennessee, the victim found out that Defendant was not separated from his wife and that he had three children.

Ms. Polk testified that the victim had mixed emotions about the new information. Ms. Polk stated that she "beg[ged]" the victim to come home; she added, "[W]hen someone tells you their name is one thing . . . then gets you halfway down, moving away from your home and your family, and you find out that's not even his name at all . . . . [W]e were all telling her to come home, just come back home."

Mr. Jack testified that he was the victim's best friend since they were in middle school. Mr. Jack stated that he met Defendant in Indianapolis shortly before the victim moved. He said that Defendant was introduced to him as "Noah" and that he knew Defendant and the victim were in a romantic relationship.

Mr. Jack testified that, on January 25, 2020, shortly before midnight, the victim called him and "her voice was shaky." Mr. Jack stated that he was afraid because he had "never heard her sound like that in all [their] years knowing each other. Just she sounded very different." According to Mr. Jack, the victim planned on coming back to Indiana that night. Mr. Jack offered to drive down and follow the victim to Indiana or meet her halfway in case her car broke down. Mr. Jack said that the conversation lasted five or six minutes and that they did not speak again.

Mr. Jack testified that, the next day, Defendant contacted him through Facebook messenger between 9:00 and 10:00 a.m., and a copy of the messages was entered as an exhibit and read into the record. The messages reflected the following conversation:

| Sent by | Text |
| --- | --- |
| Defendant | I can't get ahold of [the victim]. |
| | Wondering if you've talked to her. |
| Mr. Jack | Does she have her phone? |
| Defendant | She got mad again last night |
| | I'm sure she does |
| Mr. Jack | Whats the address to your guy's place? |
| Defendant | [] Missoula way Knoxville [TN]. |
| | I'm not sure on the actual number |
| | She wanted to stay at the bar, my brother had to leave and she just went crazy last night. I tried getting ahold of you last night |
| | She will probably blame it on me somehow, all I did was listen. |
| | She said she was going back to the bar. I left cause she wanted me too [sic], and came to Maynardville TN and stayed. |
| Mr. Jack | Her GPS is showing she's at home<br>Since midnight |
| Defendant | I've called her and called her. She won't answer me. |
| Mr. Jack | So you're not at home? |
| Defendant | Okay, she's probably asleep then |
| | She wouldn't talk last night. I hate bringing you into things like this. |
| | She gets way to [sic] offensive real quick for no reason either me. |
| Mr. Jack | I'm sure she's just passed out and hungover |

| Defendant | With*** |
| --- | --- |
| | Her car is gone |
| | Door is locked I don't have a key on me |
| | Car is here. It's in garage |
| | I got the law coming. Something isn't right. I can hear [S]imba but [the victim] isn't coming to the door |
| | Does she have any medical issues at all?? |
| | Dylan she's dead |
| | Call me now |
| Mr. Jack | You'd better be f--king lying to me |

Mr. Jack noted that Simba was the victim's dog. Mr. Jack stated that he did not believe what Defendant was telling him at the beginning of the conversation.

Mr. Jack testified that, during a telephone call with Defendant, Defendant told him that the police were going to kick down the door. During a second call, Defendant told Mr. Jack that he did not know what was going on but that he thought the victim hurt herself. Defendant told Mr. Jack that the victim was lying on the floor in the hallway and that blood was everywhere and "all over the walls." Defendant said, "I don't know what's happening. I'm shaking . . . . There's blood everywhere." Defendant also told Mr. Jack that he had been crying all day and was "a mess." Mr. Jack asked Defendant if he was sure that the victim was deceased because he was going to call Ms. Polk and did not want to tell her that the victim was dead if it was "some twisted joke." During a final telephone call, Defendant stated that he was in the backseat of a police cruiser. Mr. Jack said that Defendant sounded like he was in shock and told Mr. Jack that he was "shivering and shaking and [didn't] even have a jacket." Mr. Jack heard an officer in the background ask Defendant to hang up; the last thing Defendant said to him was that he needed to go because the police wanted to talk to him.

Mr. Jack testified that he called Knoxville police to verify that the victim was deceased, that he informed Ms. Polk, and that he drove to Knoxville that day. Mr. Jack left Knoxville by January 27, 2020. He denied leaving a note on Defendant's vehicle that read, "Your [sic] next." Mr. Jack did not know of anyone who delivered such a message.

Mr. Jack testified that, over the course of their friendship, he had seen the victim during arguments with others. He stated that she was "the master of the cold shoulder. She

was usually dismissive of whatever your argument was and she would try and just shut you down." Mr. Jack noted that he "[could not] say that [he] ever had an actual argument with her."

On cross-examination, Mr. Jack was unsurprised to hear that the victim had been described as "a free bird" and "impulsive." He denied that he and the victim had ever been in a romantic relationship, although he noted that they had discussed the possibility. He said that they openly discussed their romantic relationships with one another but that he did not know when the victim met Defendant.

After refreshing his recollection with his police statement, Mr. Jack testified that he became aware of the victim's knowing Defendant on January 4, 2020, and that the victim and Defendant became serious about their relationship around January 10, 2020. Mr. Jack agreed that the victim had been living with a romantic partner, "Danny," at the time.

Mr. Jack testified that the victim found out Defendant's real name during the move to Tennessee. He stated that Defendant's not being separated from his wife was a surprise to the victim and that Defendant had told the victim that he and his wife were in the process of divorcing. He thought that the victim found out about Defendant's marriage and children before she decided to move. Mr. Jack said that he expressed concern to the victim about her moving and that she responded that she loved Defendant and wanted to try to make things work. Mr. Jack agreed he told a detective that Defendant was not emotionally mature enough for the victim.

Mr. Jack agreed that the victim sounded intoxicated when he spoke to her on January 25. He stated that, at the conclusion of the call, the victim said something like, "I just don't know. I still have some things to figure out."

On redirect examination, Mr. Jack clarified the context of the victim's statement: "I believe I asked her kind of what the plan was after we had discussed me coming down and meeting her, and I think that was her response just 'I don't know. I still have to figure some things out.'" Mr. Jack stated that they made plans to talk again later, which never happened. Mr. Jack stated that, to his recollection, he did not hear anyone or anything else in the background of the call.

Jesse Hoover testified that he was thirty-three years old and lived in Middlesboro, Kentucky. Mr. Hoover had been friends with Defendant since they were between eleven and thirteen years old. Mr. Hoover stated that his nickname, by which Defendant addressed him, was "Opie." Mr. Hoover worked for Defendant's trucking company from 2017 until 2020. Mr. Hoover explained he drove one of the company's two trucks.

Mr. Hoover testified that Defendant was married and had three children; Mr. Hoover estimated that Defendant had been married for about fifteen years. In early January 2020, Defendant lived with his wife and children in Harrogate. Later in January, Defendant moved to Knoxville and borrowed Mr. Hoover's white Chevrolet Silverado truck to assist with moving. On January 25, 2020, Mr. Hoover drove Defendant's light blue pickup truck to Knoxville to retrieve his Silverado. Mr. Hoover estimated that it took him an hour and a half to drive from Harrogate to Knoxville.

Mr. Hoover testified that he arrived at the Missoula Way house in Knoxville around 8:00 p.m. and that Defendant and the victim were present. Mr. Hoover knew they were dating but did not know how long they had known each other; it was Mr. Hoover's first time meeting the victim. Defendant showed Mr. Hoover around the house, which had furniture and décor; he noted that one bedroom was "made up" but that the other bedrooms were not. Mr. Hoover said that Defendant smoked Camel Crush cigarettes frequently. He stated that everyone was in a good mood when he arrived.

Mr. Hoover testified that he drove Defendant and the victim to Bullfeathers bar, that they ordered food and drinks, and that the victim sang karaoke, danced, cheered for other singers, and talked to other people. Mr. Hoover stated that he and Defendant sat at their table and conversed and that he and the victim got to know each other. He said that they got along and that no arguments occurred between Defendant and the victim over the few hours they were inside. He stated that he and Defendant ate, but the victim did not.

Mr. Hoover did not recall seeing the victim kiss Defendant inside Bullfeathers. Mr. Hoover said that the victim sat beside him at times and took a photograph of them with her cell phone. He did not recall the victim's taking any photographs of Defendant.

Mr. Hoover estimated that he and Defendant drank one beer apiece and that, around 11:30 p.m. or 12:00 a.m., he wanted to leave because he had a long drive home. He and Defendant walked out to the truck, but the victim remained inside. Defendant said that he "didn't know what she was doing or what the deal was" and walked inside to get her while Mr. Hoover remained at the truck. He saw Defendant and the victim walk outside together.

Mr. Hoover testified that, during the fifteen-minute drive back to Missoula Way, Defendant and the victim did not speak to one another, although they were not arguing. Mr. Hoover stated that there was "tension" between them and that he did not know the cause. He said that Defendant was not angry with him and that they talked about "guy stuff."

Mr. Hoover testified that the victim told him goodbye and walked inside. Defendant and Mr. Hoover moved an air compressor that belonged to Mr. Hoover's father into the Silverado, then Defendant told him goodbye and entered the house. Mr. Hoover stated that

no argument was occurring at that time. He said that, when he left, the garage door was closed, and Defendant's blue truck was in the driveway.

Mr. Hoover testified that he had reached Party City on Broadway, which was about twenty-five to thirty minutes from the Missoula Way house, when Defendant called and asked him to return and pick him up. Mr. Hoover noted that Defendant was "a little hateful" and said, "Come back and f--king get me"; he noted that Defendant did not normally curse at him like that. Mr. Hoover assumed that Defendant wanted a ride to his semi-truck in Harrogate because Defendant was planning on leaving for a trucking run the next day.

Mr. Hoover testified that, twenty-five to thirty minutes later, he arrived at the Missoula Way house and pulled up on the street. He stated that the garage door was closed. Mr. Hoover stated that the garage door opened and Defendant walked out through the garage wearing the same clothing he had been wearing earlier. Mr. Hoover said that a light inside the garage came on, and he could see the victim's dog sitting in the front passenger seat of her sedan. Mr. Hoover did not hear anything but noted that his truck had "Flowmasters" on it such that the engine "rumbles pretty good." According to Mr. Hoover, Defendant had a beer in his hand and was carrying a "little case" with a handle; he did not remember whether the door to the house was open. Mr. Hoover stated that he did not think anything was unusual. Defendant got into the truck and lit a cigarette. Mr. Hoover did not see the victim in or around the house when he picked up Defendant.

Mr. Hoover testified that Defendant told him that he and the victim had argued and that she "took off walking." Mr. Hoover denied that Defendant was crying, shaking, or that there was any reason for him to be concerned at that time. Mr. Hoover also denied that they drove around looking for the victim; Mr. Hoover noted that it looked like a "pretty good neighborhood."

During the drive, Defendant "acted like he was trying to get ahold of" the victim, but Mr. Hoover never heard Defendant speak to her or saw him receive a response to text messages he sent. When they were near the Party City on Broadway, Mr. Hoover told Defendant to give him the victim's telephone number in the hope that she might answer Mr. Hoover's call even if she did not want to talk to Defendant. Mr. Hoover stopped in the Party City parking lot and sent the victim a text message, in which he identified himself as Defendant's brother and asked if there was anything he could do to help the situation. Mr. Hoover received no reply and never spoke to the victim. While in the parking lot, Defendant called his wife and said that he was coming home. Defendant's wife called Mr. Hoover and told him not to bring Defendant to their house.

According to Mr. Hoover, after forty to forty-five minutes, they reached Claiborne County, and Defendant told Mr. Hoover that "she was dead." Mr. Hoover asked what he

meant, and Defendant responded "that she was [lying] up there [on] his floor dead." Mr. Hoover stated that he did not believe Defendant, and Defendant told him to look inside the plastic case; he told Mr. Hoover that his 9 mm pistol was inside and that it was missing one round. Mr. Hoover said that, although he did not open the case, it felt like something was inside. Mr. Hoover stated that the case was made of blue or black hard plastic, and he gestured to estimate the case's size. Mr. Hoover said that he still thought Defendant was drunk and "talking off the top of his head."

Mr. Hoover testified that Defendant asked him to pull over at a location named "Brogan's" where they fished because he wanted to pray. According to Mr. Hoover, Defendant left the plastic case in the truck, got out, walked around to the back of the truck, opened the back driver's-side door, "used the bathroom," closed the door, and returned to the front passenger's seat. Mr. Hoover said that Defendant tried to get him to pull over "on the bridge" and throw the case into the water but that he declined. He stated that the case was still with them when they reached their destination.

Mr. Hoover testified that they stopped for five to ten minutes at the parking lot of Cowboy's restaurant in Harrogate, where Mr. Hoover had previously planned to meet two of his friends. They did not discuss the victim, and Defendant acted "pretty normal." Afterward, Mr. Hoover and Defendant traveled a short distance to Forge Ridge Road, where Defendant customarily kept his semi-truck cab. Mr. Hoover stated that he had given the gun case back to Defendant, who took it with him when he exited Mr. Hoover's truck. Mr. Hoover did not see the gun case again.

Mr. Hoover testified that he was almost home when Defendant called him again and stated that he could not start the truck Mr. Hoover usually drove. Mr. Hoover did not know why Defendant was trying to start the truck. Defendant asked him for help, but Mr. Hoover declined and went home instead. He acknowledged that Defendant's call log reflected a call to Mr. Hoover's telephone number at 4:44 a.m.

When asked why he did not call the police after Defendant disclosed what happened, Mr. Hoover testified that he did not believe Defendant and "thought he was just drunk and was talking . . . out of his head . . . . [N]obody would have believed he would have ever done something like that." Mr. Hoover stated that Defendant also had a small .25 caliber derringer in his pocket, that he asked Defendant for the gun, and that Defendant refused. Mr. Hoover testified that he felt unsafe when Defendant declined to give him the gun.

Mr. Hoover testified that, the following morning, Defendant called him and handed the telephone to Detective Jeremy McCord, who asked Mr. Hoover to come to the Missoula Way house. Detective McCord "put [Mr. Hoover] to the side . . . so [he] was a little bit of distance [away] from" Defendant. Mr. Hoover stated that he stood in the front or side yard

around the driveway and that he could see Defendant while Detective McCord interviewed him.

Mr. Hoover agreed that he did not tell Detective McCord that Defendant had confessed to shooting the victim. When asked for his reasoning, Mr. Hoover explained, "I answered the questions that he was asking me . . . . I ain't never talked to . . . somebody like that before. Especially a case like that, you know . . . . I just was expecting to tell them what they . . . was asking me[.]" Mr. Hoover denied shooting the victim or handling a firearm that evening, other than holding Defendant's gun case. He also denied seeing the shooting or the victim's body.

Mr. Hoover testified that Detective McCord told him that he would call at noon the following day. He said that the police took Defendant's cell phone with them but that Defendant continued to communicate with him using his iPad.

A printout of messages exchanged between Mr. Hoover and an email address associated with Defendant—GMCtruck07@outlook.com—reflected that, on the evening of January 26, 2020, Defendant asked Mr. Hoover if he was okay and if he had made it home, commenting that he had not heard from him. The following morning, Defendant messaged Mr. Hoover again and stated that he was worried about him. Mr. Hoover responded, and Defendant asked Mr. Hoover to come to a location in Middlesboro. Defendant stated, "That officer told me to stay with you and he'd call you." Defendant asked Mr. Hoover to "hang out" with him until noon, stating that he "need[ed] to talk." Mr. Hoover stated that his father needed him to help with a task. Later, Defendant asked where Mr. Hoover was and stated that he was going to try to get the truck Mr. Hoover drove running; after some conversation, Mr. Hoover asked Defendant if he was going to take a load to Chicago, as planned. Defendant responded, "I'm thinking about saying I did it. Just so I can be in jail. I'm scared for my life right now. I put her in the situation, so it's really my fault either way." The following exchange occurred through text messages:

| Author | Text |
|---|---|
| Defendant | As long as I'm on the outside, I feel like I'm a target. She was involved in a lot of stuff, and I don't want to put [Defendant's wife] and the kids through it and if I'm out here I feel like they could be in danger |
| Mr. Hoover | If I was you I would just tell the truth and be done with it that's the best thing to do and the right thing to do. |

| Defendant | I did tell the truth opie. Had I been there we both would be dead. She's into some bad things I don't know about. |

Mr. Hoover testified that Defendant had never mentioned before that the victim was involved in a dangerous lifestyle. He clarified that his message about the best and right thing to do meant that, if Defendant killed the victim, the right thing to do was to tell the truth. Mr. Hoover stated that he spoke with the police again and told them the version of events to which he had testified.

On cross-examination, Mr. Hoover acknowledged that Defendant's mother left when Defendant was five years old, and Defendant's father died before he was born; Mr. Hoover lost his mother at a young age too. He stated that, although they were not in the same grade in school, he and Defendant both took special education classes, spent a lot of time together, and called one another brother. Mr. Hoover did not know that Defendant had been abused as a child. He agreed that Defendant spent "every moment" with him when Defendant was not with his family or on the road.

Mr. Hoover testified that, on January 25, 2020, Defendant was "pretty well-lit" and was drinking when he arrived. Mr. Hoover stated that the victim drank once they got to Bullfeathers; he could not recall if she had been drinking before that. When asked if Defendant drank "20 ounce beers" at Bullfeathers, Mr. Hoover stated that he remembered Defendant's drinking "12-ounce bottles."

Mr. Hoover identified himself, Defendant, and the victim in a surveillance recording from Bullfeathers. Mr. Hoover agreed that the recording showed a waitress "refresh[ing]" their beers several times. He further agreed that Defendant was a "big boy" and "put them down." Mr. Hoover affirmed that the victim had a "little bit to drink" and that she sang and danced. Mr. Hoover stated that the atmosphere was "pretty chill" and did not recall anyone's getting aggravated. He said that the victim was "hugging on" Defendant that night and that she was "pretty friendly with folks" and "really active." Mr. Hoover stated that the victim met a man and brought him over to meet them. He did not recall the victim's photographing a man who was dancing but acknowledged that the surveillance recording accurately captured the relevant events. Mr. Hoover did not remember anything notable happening at Bullfeathers, and he did not recall the victim's getting angry with Defendant. When asked whether the victim pointed out that Defendant was watching another woman's rear end, Mr. Hoover did not recall such an incident. Mr. Hoover agreed that a lot of smoking and drinking occurred and that the victim wanted to sing karaoke.

The surveillance recording was received as an exhibit and reflected a karaoke stage on the left side of the frame with a small dance floor in front of it. The stage was surrounded

by tables.  The time-stamp[1] on the recording started at 9:07 p.m.  Defendant and Mr. Hoover were seated at a high table at the far side of the empty dance floor beside the stage. The victim stood and danced for much of the recording, but she predominately stayed beside Defendant; when she was on the dance floor, she frequently interacted with Defendant by singing and dancing in his direction.  Mr. Hoover looked at his cell phone often but conversed with Defendant at times and, to a lesser extent, the victim.  The victim was attentive to and affectionate with Defendant; she hugged and kissed him periodically. The victim walked out of the camera frame several times; on average, she would reappear between thirty seconds and a minute later and return to the table.  At most, she was gone for two or three minutes.  The victim used her cell phone to take "selfies" of herself with Mr. Hoover and Defendant.

During the course of the evening, the victim conversed briefly with a middle-aged man with a long beard and brought him over to meet Defendant and Mr. Hoover.  The victim high-fived and encouraged other people who were singing karaoke, and she briefly interacted with most of the people sitting around the dance floor.  At one point, a man with long hair conversed with Defendant and Mr. Hoover at their table; the victim later sang a karaoke song with the long-haired man and another woman.  The victim also talked to a blonde woman who was sitting on the opposite side of the dance floor; after they spoke a couple of times, the victim hugged the woman, and they shook hands.

At one point, Defendant leaned slightly back as though looking around the victim, who was standing nearer to Mr. Hoover.  Two women were conversing at the edge of the dance floor in the area in which Defendant was looking.  The victim subsequently looked toward the women, said something to Defendant and Mr. Hoover, turned and gestured at the back of her pants, and turned around and gestured at the back of one of the women's pants.

At the conclusion of the victim's karaoke song with the other woman and long-haired man, the victim walked out of the camera frame before returning to the table.  The victim leaned toward Defendant such that neither of their faces was visible.  After a minute or two, Defendant stood up, and Mr. Hoover handed the victim her jacket.  The victim's demeanor became more subdued.  The men walked out at 11:21 p.m., but the victim walked over to the blonde woman and spoke with her instead of leaving.  The victim and the blonde woman looked at the victim's phone together before the victim walked off camera for the last time at 11:23 p.m.

---

[1] The time-stamp displayed in military time, and Detective McCord testified that his investigation reflected that the time-stamp was forty-five minutes fast.  For ease of reference, we will use standard time adjusted to correct the forty-five-minute disparity.

- 12 -

Mr. Hoover testified that he wanted to leave Bullfeathers because he had plans to meet with his friends, he had a long drive, and he had church in the morning. He did not know when Defendant told the victim it was time to go, although he acknowledged that the victim stayed after he and Defendant walked outside. Mr. Hoover denied that he felt tense while waiting for the victim to come out. After watching the surveillance recording, Mr. Hoover stated that, after waiting for the victim, he and Defendant walked back to the front door and that Defendant went inside to get the victim.

Mr. Hoover agreed that the victim was a little quiet or "sullen" on the drive home. Mr. Hoover stated that, if the recording of his police interview reflected that he said Defendant was not acting upset "at all," it was correct, although he had no independent recollection of his statement. He stated that he did not think anything was unusual when he dropped off Defendant and the victim. Mr. Hoover agreed that Defendant was "still pretty drunk" when he dropped them off.

Mr. Hoover acknowledged that the call log reflected that Defendant called him to come back at about 11:54 p.m. He stated that he was thirty minutes into his drive, that he was tired and had consumed one and a half beers, that he had plans to meet his friends, and that he did not want to pick up Defendant. Although Mr. Hoover declined to describe Defendant as "insistent," he agreed that Defendant had never cursed at him before. Mr. Hoover noted that he assumed Defendant was upset about the argument Defendant had with the victim. He agreed that Defendant eventually apologized for the language he used.

Mr. Hoover testified that, when he picked up Defendant, Defendant was wearing a t-shirt, blue jeans, and boots, and that he carried his cell phone and a beer. Mr. Hoover added that he was also "packing that case out."

Mr. Hoover agreed that he had previously spoken to defense counsel and Detective McCord and that he had testified at the preliminary hearing. Relative to his statement to Detective McCord, Mr. Hoover agreed that he knew the investigation involved a death and possible murder and that the information Detective McCord needed was important. He acknowledged that he told Detective McCord that he wanted to tell him the truth. Mr. Hoover initially stated that he told Detective McCord about the gun case but later said that he did not remember exactly what he told him. He did not recall Detective McCord's asking him if Defendant looked like he had been in a fight. Defense counsel read aloud from Mr. Hoover's police statement, in which he stated, "No, he looked fine. All he had was he, he just came out. He was holding a beer."

When asked whether he lied to Detective McCord, Mr. Hoover responded that it had been two and a half years since he made the statement and that he did not remember verbatim what he said. He averred that he told Detective McCord the truth. When asked whether the truth was that Defendant only had a beer in his hand, Mr. Hoover said, "Well,

not when he come walking out, no." After a portion of his recorded police interview was played, Mr. Hoover acknowledged only having mentioned Defendant's carrying a beer. He noted that he also told Detective McCord he would tell him if he thought of anything else and that he did, in fact, tell Detective McCord what he remembered later.

Mr. Hoover denied changing his story and stated that he added to it. When asked whether he worried that he would be charged with a crime, Mr. Hoover answered negatively and commented that he did not hide anything from the police.

Mr. Hoover testified that he "probably" spoke to Detective McCord on January 27, 2020, at noon, although he did not remember the content of the conversation. When asked whether he remembered "deciding at this point that there might have been" a gun case, Mr. Hoover responded, "I mean he come walking out carrying it." Mr. Hoover said that he told Detective McCord the gun case was black or blue. He did not remember his preliminary hearing testimony about the case's color, but he did recall testifying that he took a gun from Defendant and "put it up under [his] arm."

Mr. Hoover agreed that he pulled over at Party City because Defendant was "crying and sobbing." Mr. Hoover said that Defendant was not crying when he picked him up. Mr. Hoover agreed again that he pulled over at Party City because Defendant was upset; however, he immediately stated that Defendant was not upset at that time and that Defendant only started crying when he was on the telephone with his wife. Mr. Hoover did not recall testifying at the preliminary hearing that he pulled over because he was concerned about Defendant, who "was just crying and going on and on."

Mr. Hoover agreed that he texted the victim because Defendant was upset and that he was trying to help Defendant "[f]igure it out." Mr. Hoover noted that he did not know if Defendant was crying about the victim or his wife; he then agreed that Defendant was crying about both of them. He agreed that, at that point in the evening, he did not understand Defendant's behavior. Mr. Hoover testified that Defendant wanted to go to the home he shared with his wife when he called her. He agreed that Defendant wanted to go back to his wife, whom Defendant had just left. Mr. Hoover noted that Defendant's wife called Mr. Hoover and said, "He's too drunk. Take him somewhere else to sleep it off."

Mr. Hoover testified that, when Defendant confessed to killing the victim, he told Defendant he was crazy. He said that Defendant was drunk and upset enough that he was concerned Defendant would hurt himself. Mr. Hoover maintained, though, that he took the gun[2] when Defendant got into the truck, not when Defendant became upset. He did not

---

[2] Defense counsel questioned Mr. Hoover about "the gun" here, not the gun case; it was unclear whether Mr. Hoover had indicated in previous testimony or police statements that he took Defendant's gun instead of the gun case.

recall telling Detective McCord that he took the gun from Defendant because he was afraid Defendant was depressed and would hurt himself. When read a portion of his police interview, during which he stated he placed the gun beside him because he did not want Defendant to "do something crazy" or try to shoot himself, Mr. Hoover testified that he recalled saying that but that he did not remember taking the gun from Defendant. He noted that he tried to take the derringer Defendant was also carrying, but that Defendant would not give it to him. When asked whether he had a reason to take Defendant's gun if Defendant was not upset when he entered Mr. Hoover's truck, he responded, "[A] drunk man with a gun?" Mr. Hoover stated that, if he had thought something bad was going to happen when he drove away from the house, he would have tried to stop it.

Mr. Hoover disagreed that the first time he mentioned Defendant's derringer was at trial; he knew he did not tell the police about it in his first interview, and he could not remember whether he included the derringer in his telephone conversation with police, at the preliminary hearing, or during his conversations with defense counsel. He noted that he told the prosecutors about it "[t]he other day." Mr. Hoover had seen the derringer before a "long time ago." Mr. Hoover denied selling his Silverado truck or that the truck belonged to his father. When asked whether he "got rid of" guns he owned, Mr. Hoover noted that he had never owned a gun.

On redirect examination, Mr. Hoover testified that it was an "intense" experience to learn that his best friend had killed the victim. He stated that he did not know how best to handle that information. Mr. Hoover remembered "[b]its and pieces" of his interview outside the Missoula Way house. Mr. Hoover agreed that Detective McCord asked him if Defendant had "anything on his hands" or looked like he had just been in a fight; Mr. Hoover had responded, "No, he looked fine. All he had was – he just come out here. He was, ah, holding a beer." Mr. Hoover stated that he prided himself on loyalty to his friends. He agreed that Defendant was his sole source of income and that, after Defendant was charged, he quit or the job "went away." Mr. Hoover said that Defendant referred to the derringer as "a little .25."

On recross-examination, Mr. Hoover agreed that, after Defendant disclosed having killed the victim, he did not call 9-1-1 and went to meet his friends.

### B. Police/First Responder testimony

Michael Mayes, the record keeper for Knox County Emergency Communications District 9-1-1, identified a recording and computer aided dispatch (CAD) report related to this case, which were received as exhibits. The recording began at 11:11 a.m. on January 26, 2020, and reflected that Defendant called the Knoxville Police Department (KPD) non-emergency dispatcher and reported that he was trying unsuccessfully to get into his house. He stated that his twenty-five-year-old girlfriend and her dog were inside, that he could

- 15 -

hear the dog, and that she was not coming to the door. He said that he had a key but that it was inside. The dispatcher asked Defendant what he wanted to do; Defendant responded that he did not know, and he noted that he thought it was "weird" for the dog to be out when his girlfriend was not coming to the door. Defendant said that he went to the back door and front door and that he could hear the dog coming to each door as he did so. He noted that his girlfriend was usually with the dog when the dog was loose inside the house. Defendant stated that his girlfriend's car was in the garage, that he could not see inside the house, and that he knew she was inside. He said that he initially thought she was just inside sleeping or "passed out" but that he had banged on all the windows and that, if she was inside, something was wrong. Defendant stated that he had been there for an hour and that he needed to do something.

Defendant affirmed that the house was his; he stated that he had tried unsuccessfully to force entry. He commented that they had only moved in "last night." When asked whether his girlfriend had any medical issues, Defendant responded that he did not know of any but that they had only been dating for a month and a half. He stated that he did not know her medical history or her mother's name.

Defendant stated that, the previous evening, they had gone to a bar and returned about midnight, that he and the victim had argued, that she had "got[ten] crazy" and "ran [Defendant] off," that he had called his brother to come get him, and that he had returned to the house that morning. When asked for his name, Defendant gave it and commented that "the only thing [he had] ever done" was receive a speeding ticket five years ago.

Defendant said that he called the victim's best friend that morning and told him about the argument. Defendant claimed that, a couple weeks prior, the victim had "done this too" in Indiana; he stated that the victim had been out of contact for twelve hours and that she had spent all night out at a bar, lost her wallet, and stayed the night with another woman. Defendant noted that the current situation "feels different." The operator stated that he would have an officer respond but would also transfer Defendant to Rural Metro dispatch so that EMS and firefighters would be called.

Knox County Rural Metro firefighter Ray Bise testified that he responded to Missoula Way for Defendant's "EDMS call with a possible forced entry." He met Defendant in the house's driveway where Defendant verified that he lived in the house but that he did not have a key. Defendant's semi-truck cab was parked at the curb in front of the driveway, and a blue pickup truck was parked in the driveway.

Mr. Bise testified that he tried the front door and back door, which was a French door with glass and blinds. Mr. Bise, Defendant, and the EMS workers tried to look through the blinds. Mr. Bise stated that he looked through the blind slats on his hands and knees and saw clothing items in the hallway. Defendant told Mr. Bise that "he could see

- 16 -

blood on the wall and see her." Mr. Bise used a "car lockout kit" to "trip" the garage door's emergency pull and forced open the door from the garage to the house.

Mr. Bise testified that he was the first to enter the house and that he found the victim's body in the hallway to his right. He noted that she was cold to the touch and obviously deceased and that he did not attempt CPR in an effort to preserve the scene. Mr. Bise stated that Defendant came inside. Mr. Bise briefly verified that no other people were inside the house, and then deputies with the Knox County Sheriff's Office (KCSO) arrived and took over the scene. Mr. Bise said that, although Defendant was still upset or agitated during this time, he was not screaming or crying.

On cross-examination, Mr. Bise testified that the back blinds were "messed up and open" and that he asked Defendant if he could see anything abnormal. Mr. Bise stated that Defendant commented about seeing the victim and blood at the same time Mr. Bise saw the clothing. Mr. Bise testified that Defendant became upset and "had a reaction" when he told Mr. Bise that he saw blood. He stated that, after he walked through the house to verify that no one else needed help, he exited. Mr. Bise did not see a dog.

KCSO Deputy Tyler Gresham testified that he responded to Missoula Way and that he was a training officer at the time. He stated that a fire truck and EMS were on scene and that they had already entered the house when he arrived. Deputy Gresham stated that the house was cleared once it was determined that a death had occurred and that he kept a log of who went in and out of the crime scene.

Deputy Gresham identified a recording from his body camera, which reflected his arriving at the house. A fire truck and ambulance were parked on the street, and a semi-truck cab without a trailer was parked in front of the driveway and blocking it. A blue pickup truck was on the right side of the driveway. The house had a one-car garage to the left of the front door, and a tan or gold sedan was parked inside. Defendant, who was wearing a Lynyrd Skynyrd t-shirt and baseball cap, was standing to the left of the doorway with the firefighter. He was audible in the background stating that they had just moved a week and a half ago. Defendant identified himself to Deputy Gresham as the victim's boyfriend. Deputy Gresham asked everyone to leave; Defendant asked if he could get a jacket before he left, and Deputy Gresham responded negatively and told Defendant that he could sit inside one of the first responders' vehicles because the house was a crime scene.

On cross-examination, Deputy Gresham testified that all of the first responders had entered through the garage. He thought a dog was inside one of the bedrooms but did not recall how it got there. Deputy Gresham did not recall Defendant's smelling of alcohol.

- 17 -

Former KCSO forensic technician Megan Stark Queener testified that she documented the scene with photographs and video. The crime scene photographs were received as exhibits and reflected that the light blue pickup truck had a Claiborne County license plate; the sedan inside the garage was a Chevrolet Cavalier with an Indiana license plate. Inside the house in the hallway, a black wire basket containing toiletry items was on the floor behind a couch that served as a partition between the living room and the hallway and entryway to the garage. Just inside the door to the garage, clothing on hangers were on the floor in a pile, and the victim's left blue jean leg and tan boot were visible protruding from underneath the clothing. Some blood spatter was visible on the victim's boot, the baseboard at the threshold of the hallway, and the tiled entryway to the garage.

Inside the hallway, the victim, who was wearing blue jeans and a pink tank top, was lying on her back with her right leg folded back and to the side; her right arm rested on her torso, and her left arm, which had heavy bloodstains, was extended by her side. The victim's head was turned to the left, and no injury was immediately visible on her head. The pile of clothing covered part of the victim's lower body beginning at knee level. A cigarette butt and ash were visible underneath the ends of the victim's hair in the hallway; Ms. Queener stated that it was "consistent with the Camel Crush brand with the blue lines."

An iPhone was protruding from the victim's left front pocket; a small baggie of green plant material, which Ms. Queener identified as "assumed" marijuana, was in the victim's right front pocket. A large pool of blood was underneath the victim's head, left shoulder, and left arm, and the wall beside the victim contained bloodstains as though a body part had swiped the wall. The wall and baseboards also contained droplets and drips of blood. The pool of blood at the victim's head also extended across the floor to the baseboard, in a shape that appeared as though it may have been created by a swiping motion.

A single shell casing was photographed close to the victim's body inside the threshold of an adjacent bedroom, beside a door on the carpet. Ms. Queener noted that it was later determined to be a 9 mm Luger round. In the bedroom, a rifle was propped up beside the closet; Ms. Queener noted that they later identified it as a "pellet gun, an Airsoft rifle." Clothing and hangers were strewn about the floor. A pink satin duffle bag was in front of the open closet doors, and multiple tote bags and a laundry basket were in the corner of the room diagonally opposite the door. The bedroom closet had no clothes hanging in it, and a pair of winter boots, a piece of clothing, and a black LG cell phone were sitting on a shelf. A second bedroom contained a black headset and a duffle bag containing men's clothing.

The living room contained a brown sectional sofa and a leather recliner. Two small, empty bookshelves were located beside a window and the television. A small coffee table contained open, partially full bottles of Crown Royal and juice; the lids had been placed

nearby on the table. A basket of toiletry and bathroom items was on one side of the sofa beside the black wire basket; a small zippered pouch in the basket contained a paper with a copy of the victim's Indiana identification. Photographs of the front door reflected that the door and frame did not appear to be damaged.

Photographs of the back porch reflected that the French door blinds had one slat askew just above the deadbolt. A trash can on the porch contained a Camel Crush cigarette pack.

In the kitchen, a copy of Defendant's lease was inside a cabinet, and a drawer contained multiple packs of Camel Crush menthol cigarettes and another black cell phone. The lease reflected that the rental period for the Missoula Way house was January 20, 2020, through January 20, 2021. A cigarette butt on the kitchen floor had one thick blue line with "Camel" printed below it, and a small blue camel was printed above it. A photograph of the kitchen trash can reflected several empty beer bottles.

Ms. Queener identified photographs one of her colleagues took, which reflected a medium-sized brindle dog and another bedroom with a bed; a small plant and beer bottle were tipped over on the bedspread. Ms. Queener noted that the dog had been found in this bedroom.

Photographs of Defendant's semi-truck cab reflected that it contained a sleeping area with a bed. A small black handgun was located inside a compartment; the barrel had "Model C8380 CAL 380" inscribed on it. The gun contained two unfired rounds. Two packs of Camel Crush Menthol Silver cigarettes were in the front passenger seat, and an empty pack was in the floorboard.

Photographs of the victim's sedan reflected that a hamper full of clothes and clothing on hangers were stacked in the backseat to the height of the front seat headrests. A large plastic grey tote was inside the trunk. A blue tube identified by Ms. Queener as a smoking pipe and a pack of Camel Crush cigarettes were in the center console. Mail addressed to the victim was inside the car.

Ms. Queener testified that she took gunshot residue (GSR) swabs from Defendant's and the victim's hands. Ms. Queener identified a photograph of a piece of notebook paper, which had "Your Next" written in a brown-red substance. She stated that a swab taken from the paper was sent to the Tennessee Bureau of Investigation (TBI) for testing.[3]

---

[3] A TBI forensic biology report entered into evidence does not reflect that the swab from the note was tested.

- 19 -

On cross-examination, Ms. Queener testified that she thought different types of Camel Crush cigarettes existed, but she was uncertain. She did not know what kind of Camel Crush cigarettes were at the scene, and she did not document the appearance of the unused cigarettes at the scene or in Defendant's possession when he turned himself in. She agreed that the cigarette butts found underneath the victim's hair and in the kitchen were different in appearance. Ms. Queener stated that the beer bottles in the kitchen trash were not tested. She agreed that Defendant signed a consent form to search the house and consented to the GSR swab.

KCSO Detective Jeremy McCord testified that he was the lead detective on Defendant's case and that he initially interviewed Defendant at the scene inside his police cruiser because it was cold outside. His body camera recording of the interview was received as an exhibit and reflected that Detective McCord placed the camera on the dashboard such that the recording appeared sideways to the viewer. Defendant sat in the front passenger seat smoking a cigarette, and Detective McCord was in the driver's seat. Defendant's demeanor was subdued, and he blinked often and sniffled occasionally. Defendant stated that he had signed a rental agreement for the house on Missoula Way one and a half weeks previously. Defendant commented that the officers would probably find marijuana inside the house; he stated that the victim smoked marijuana but that he had never smoked marijuana because he had a commercial driver's license (CDL). Defendant stated that he drank "a lot" the previous evening. Detective McCord noted that he could smell alcohol on Defendant, and Defendant denied that he was still intoxicated. Defendant noted that he had stopped drinking at midnight.

When asked if the victim had any local family, Defendant responded negatively and added, "It's all weird to me." Detective McCord told Defendant that he could leave the police cruiser without giving a statement, and Defendant replied that he wanted to cooperate. Detective McCord advised Defendant of his *Miranda* rights, and Defendant stated that he understood them. Defendant said that he completed six months of college studying to be a "transportation specialist." Detective McCord informed Defendant that he could revoke consent to search or choose not to answer questions at any time.

Defendant stated that he had lived at the Missoula Way house for about a week and was in the process of moving in. Defendant stated that he met the victim at an adult club in Crawfordsville, Indiana, thirty-five days previously. Defendant stated that the victim had worked as a dancer at the club but had quit her job for Defendant. Defendant said that he was self-employed as a truck driver and that he was supposed to haul a load of plastic pipe from Harrogate that day. Defendant's telephone rang, and Defendant stated that the caller was the victim's best friend, Dylan, in Indiana.

Defendant told Detective McCord that he and the victim had been "seeing each other" for a month and a half but that they had only been in a defined relationship for a

week and a half. Defendant said that he was in the process of divorcing his wife. He stated that only his name was on the lease of the Missoula Way house but that the victim was going to have the utilities registered in her name the following week.

Defendant told Detective McCord that the victim had traveled with him in his truck to Fort Lauderdale, Florida, the previous Wednesday and Thursday and that the trip had gone well. Defendant stated that he dropped the victim off at her car on Friday and drove to Middlesboro to load his truck. He said that he returned to Knoxville around 4:00 or 5:00 p.m., that he and the victim shopped for a television, and that they went to bed early. Defendant said that he got up at 6:30 a.m. on Saturday and went to the laundromat in Mr. Hoover's[4] Chevrolet Silverado truck around 7:00 a.m. He had borrowed the truck earlier in the week to transport the sofa and bedroom furniture he and the victim had purchased. Defendant said that he finished at the laundromat around 8:20 a.m. and returned home after buying two coffees at a gas station. The victim texted him at 8:30 a.m. when she woke up and had made herself breakfast when he arrived. Defendant stated that the victim did not like the coffee he brought her, but that she was not upset.

Defendant said that he began unpacking, that the victim wanted the master bedroom closet for her clothing, and that he hung his clothes in the closet in his "office." Defendant stated that, after he hung up his clothes, he and the victim "sat around" because she was tired. He stated that he and the victim had been having "a lot" of sexual intercourse and that the last time occurred when they got home on Friday morning around 3:30 or 4:00 a.m. Defendant added that the victim took him back to his truck at about 9:00 a.m., after which he drove to Middlesboro to load up.

When Detective McCord asked Defendant for his telephone number, Defendant responded, "Well, that's strange. I've got two phones and I can't find the other one. It's very possible that it was left at that bar, because I had them both there last night." Defendant noted that the cell phone he had was his work phone and that he did not have Mr. Jack's number on it.

Detective McCord noted that the victim's car had a lot of stuff in it, and he asked if the victim was moving out. Defendant responded negatively and stated that the victim was moving in.

Defendant stated that he and the victim went to Bullfeathers between 8:30 p.m. and 9:00 p.m. on Saturday. He said that the victim had a silver iPhone, but he did not know whether she had a passcode or what it was. Defendant provided Detective McCord with the victim's telephone number.

---

[4] Defendant referred to Mr. Hoover as his brother for the first part of the interview but eventually identified him by name and clarified that they were not related.

Defendant was unsure how much alcohol the victim consumed at Bullfeathers; he noted that she usually drank shots, although he did not see if she had any that night.  He said that they left between 11:30 p.m. and 12:00 a.m.  When asked what vehicle they drove, Defendant added that Mr. Hoover had brought Defendant his blue truck and had driven the trio to Bullfeathers in his white Silverado.

Defendant stated that the victim became angry the previous evening because she liked to "party," which he clarified meant staying out late, and that Mr. Hoover needed to get home to take his grandmother to church on Sunday morning.  Defendant said that he went outside to smoke and that the victim wanted them to leave her at Bullfeathers and come back to get her later, which he was unwilling to do because she was in an unfamiliar town.  Defendant noted that the victim was "used to going and just finding somebody to go home with, I mean, it's--that's just as simple as I can put it."  He said that the victim often went to "Broad Ripple," an area of Indianapolis with a "strip of bars," and that she talked about doing "bumps" of "some kind of drug."  Defendant denied that the victim took any illicit drugs the previous evening or that he knew what kind of drugs the victim used.

Defendant stated that he talked the victim into leaving, that she was upset, and that he was willing to take the victim back to Bullfeathers in his truck after they were dropped off because "at this point in our relationship . . . I'm willing to do anything she wants to do."  He said that Mr. Hoover left without entering the house between 11:30 p.m. and 12:30 a.m.

Using his cell phone's call history, Defendant determined that he called Mr. Hoover at 12:11 a.m. to ask him for a ride.  Defendant said that the victim "ran [him] off," that she told him they would talk about it tomorrow, and that he did not want to drive because he had been drinking.  Defendant stated that, when he left, the victim was in the garage smoking marijuana with the garage door closed.  He denied that he had a house key with him.  When asked why he did not take his key, Defendant responded that he "just left."  He said that the victim closed the garage door behind him.  Defendant stated that he stayed outside for five to ten minutes smoking cigarettes before Mr. Hoover arrived.  He denied that he and the victim were yelling at each other, and he noted that the argument was not a "big deal."

Defendant said that, after Mr. Hoover picked him up, Defendant called his wife and asked to stay with her, which she did not allow.  Defendant stated that he asked Mr. Hoover to take him to his semi-truck on Forge Ridge Road in Harrogate.  Defendant said that he started the truck and slept there.

Defendant stated that he tried unsuccessfully to call the victim at 1:36 a.m., 1:50 a.m., and 2:20 a.m., and that he messaged her that he was sorry.  Defendant denied coming back to the house that night.  When asked whether he was concerned that the victim might

have left the house again, Defendant responded negatively. He said that the victim had "done this once before," when she went to Broad Ripple and never texted him goodnight. He relayed that, on that occasion, the victim called him at 11:00 a.m. the next day and told him that she had gone home with "some girl." Defendant volunteered that he did not know why he fell in love with the victim, he "just did."

Defendant stated that he sent a Facebook message to the victim at 10:15 a.m. that he was on his way to the house; the victim never responded. Defendant said he had also tried unsuccessfully to call her, and he sent other messages asking her to please pick up and to call him, that he just wanted to talk, and that he was sorry and did not want to argue. He noted that none of the messages were marked as having been seen by the victim. Detective McCord asked if he had deleted previous messages with the victim, and Defendant explained that he had never messaged the victim from his work phone before. Defendant stated that the victim had her cell phone and had been talking to someone before he left.

When Detective McCord encouraged Defendant to tell him the truth of what happened, Defendant denied that he did anything. Defendant said that, before driving back to the house, he stopped and bought coffee at a Knoxville gas station about ten minutes from the house. He stated that he was supposed to drive a load to Illinois that day but that he promised the victim he would not leave until Monday.

Defendant gave consent for officers to search his semi-truck; he noted that a .32 or .38 caliber derringer was inside. Defendant denied having fired a gun in the past twenty-four hours. When Detective McCord obtained permission to perform a GSR swab, Defendant asked him, "Was she, was she shot?" Detective McCord stated that he could not disclose anything. When asked whether any firearms were in the house, Defendant responded negatively; he denied that the victim had a gun.

Defendant stated that he began to panic on the drive to the house because he could not reach the victim. He said that he messaged Mr. Jack at 9:52 a.m. asking Mr. Jack to call him. Defendant noted that he had called Mr. Jack before when the victim fell out of contact. Mr. Jack responded that he was at work, and Defendant stated that he told Mr. Jack that he was "just worried again."

When asked whether the victim had ever made statements about harming herself, Defendant said that the victim had pills to which she was allergic and that she had tried to take them one week previously after an incident in Indianapolis. He stated that, during the incident, the victim was trying to collect her belongings, that her ex-boyfriend hit her in the back with a guitar, and that the police were called. Defendant stated that he looked for a mark and could not see one; he commented that he did not know if she had lied about being hit.

- 23 -

Defendant stated that, when he arrived at the Missoula Way house on Sunday, the garage door was closed, and the doors were locked. He opined that the house looked normal from the outside, and he denied going inside before first responders arrived. Defendant said, though, that Simba was "roaming the house," which was "odd, in a way, because that mean[t] she was home." He noted that the victim typically shut Simba in a bedroom if she left. Defendant said that he climbed the back porch to see if the victim left the back door unlocked. Defendant said that the back door was locked and that he could not see anything inside from the window. Defendant stated that he beat on the windows for about thirty minutes, that he "knew something was wrong" because Simba was out, and that he thought the victim took the pills to which she was allergic and was unconscious. Defendant said that, after he called the police, he and the firefighters were trying to get in the back door and that Simba was "tearing the blind[s] up," at which point Defendant could see the victim on the hallway floor. He stated that the firefighters forced entry into the house through the garage. Defendant stated that he shut Simba in the master bedroom at that point. At the conclusion of the interview, Defendant interjected that the victim had said she was going to leave the house again but that he did not know if the victim had done so.

Detective McCord testified that police never recovered Defendant's "main personal phone." Detective McCord stated that he did not see the victim's body or any blood when he tried to look through the slanted slat in the back door blinds.

Detective McCord testified that he conducted a second interview with Defendant at the scene. Detective McCord's body camera recording of the interview was received as an exhibit and reflected that Detective McCord and Defendant were again inside the police cruiser. Detective McCord told Defendant that he needed to be honest with him and stated that Defendant's blue truck had been backed into the driveway at an unspecified time. Defendant stated that Detective McCord was mistaken, and Detective McCord asked if "the witnesses" were mistaken. Defendant stated that the truck had been there since the previous evening and that he had not moved it since Mr. Hoover brought it to him. Detective McCord said that a smear was found on one of the truck's door handles and asked if Defendant had touched it or had blood on him. Detective McCord asked to see Defendant's hands, and he complied.

Detective McCord commented that Simba did not have blood on him, in spite of being loose in the house. Detective McCord said that it made no sense for the dog not to have stepped in blood, but that the dog had not been around the victim's body. Defendant repeated that Mr. Hoover had parked the blue truck in the driveway and that it had not been moved. Detective McCord asked for Defendant to call Mr. Hoover; Defendant placed Mr. Hoover on speaker phone, and Detective McCord identified himself and asked Mr. Hoover to come to the scene; Mr. Hoover responded that he was a couple of hours away but agreed to drive there.

Detective McCord told Defendant that his version of events did not match the forensic evidence inside the house. Defendant interrupted to tell Detective McCord that he had just remembered that he bought his coffee that morning at Kay's Market in Maynardville. Defendant reiterated that, when he knocked on the front door, he heard Simba run down the hallway to the door and bark. He stated that when Simba "got [his] scent," he stopped barking and began whining. Defendant said that he stood there for about five minutes knocking on the door, that he looked in the windows and did not see anything, and that he checked the back door. He stated that Simba continued crying and that, when the fire department arrived, Simba could smell that strangers had arrived and began "tearing up" the back door blinds in an effort to get out. Defendant asserted that Simba had been out "all day."

Detective McCord repeated that Defendant's statement did not make sense, and Defendant responded that he was simply telling him what he saw when he arrived at the house that morning. Detective McCord noted that, in his experience, dogs would go to their injured owners and step in blood or lick the person's face, and Detective McCord repeated that Simba had no blood on him. Detective McCord encouraged Defendant to tell him if something happened or Defendant knew additional information.

Defendant said that he did not want to "start anything" but that the victim talked about her "crazy ex-boyfriend Caleb" who would come home drunk and beat her. Defendant noted that he did not know Caleb and that Caleb did not know the victim had moved to Knoxville. Detective McCord stated that the house had not been broken into, that the victim had not been robbed, and that Defendant had been the last person to leave the house.

Detective McCord asked Defendant which expenses he paid, and Defendant stated that he paid the rent, the bar tab at Bullfeathers, and for gas for his vehicle; he did not pay for the victim's gas. Detective McCord asked if it bothered Defendant that he was the one who left the house in the middle of the night, considering that he was paying for it. Defendant stated that the victim was going to look for jobs the following day and that he had given the victim $300 a couple of days ago.

Detective McCord stated that he had looked through the blind slat and that he could not see the victim. Defendant responded that he could see the blood on the wall. Defendant commented that the victim appeared to have been folding laundry or putting it somewhere. When asked why the victim was putting clothing in her car, Defendant responded, "She was moving out--er, moving in." Detective McCord theorized that the victim was leaving because she was "done with being told what to do." Defendant denied that this was the case and remarked that the victim told him what to do. Defendant stated that he "went head over heels for this girl." Defendant said that they had just moved in, that they placed their clothes in separate closets, and that they slept in the third bedroom. Detective McCord

noted that it seemed like the victim was carrying clothing to her car when something stopped her inside the house.

Detective McCord mentioned the possibility that something had happened when Defendant had been "blackout drunk." Defendant stated, "No, I remember everything," and he noted that he had only been blackout drunk one time three years previously. As Detective McCord discussed that his investigation was for the sake of the victim, Defendant interrupted and stated that he thought the victim had gone out again that night. Defendant said that a man at Bullfeathers had wanted the victim to sing karaoke with him and that the victim wanted to stay there because of him. Defendant denied that it bothered him and said that the victim was "like that" and that he knew "what [he] got [him]self into." Defendant said that he "love[d] her to death."

When asked if the victim would have driven her car to go out, Defendant responded affirmatively. Defendant said that the victim carried her marijuana and money in a small handbag. He noted that her permanent identification card was sent to the house in which she had lived with Caleb and that she was so afraid of Caleb that she did not retrieve it before she moved. Defendant stated that the victim's mother was supposed to mail it to her.

Defendant stated that the messages he and the victim exchanged were all on his primary cell phone. Defendant said that the victim's contact was labeled in his work cell phone as "Mizz Polk" and in his primary cell phone as "Indiana Starlight." Defendant remarked, "Honestly, . . . from meeting her and what she used to do and everything, . . . I guess, it was silly to pursue a relationship with a woman like that, but I loved her."

When confronted, Defendant denied that he killed the victim. He stated that, when he left, the victim was alive, "b--ching," and smoking marijuana. Defendant said that, in an effort to make the victim jealous, he told her that he was going to leave for Illinois the next day. He stated that he wanted to "entice" her to ask him to say. However, the victim did not "buy it."

Defendant noted that he had no close friends or family to talk to aside from Mr. Hoover; he stated that his father had died before he was born, that his mother had passed away three years ago, and that his grandparents who raised him were deceased. When asked about Mr. Hoover, Defendant said that he "love[d] him to death" and considered him his best friend but that Mr. Hoover was not "all there." Defendant opined that he could not talk to Mr. Hoover about this. Detective McCord said that he would provide information about mental health resources. Unprompted, Defendant asked, "Was it a gunshot wound?" Detective McCord stated that he did not know because they had not been able to move the victim's body. Defendant asked, "Did she do it?" Detective McCord repeated that they did not know.

- 26 -

Defendant denied that he had GPS tracking on his semi-truck. When asked if the victim would have driven Defendant's blue truck if she left the house again, he stated that it was possible, but "it was still pulled in. [Mr. Hoover] won't back in." Defendant noted that the victim loved the blue truck when she saw it. Defendant stated that Mr. Hoover did not drink or use drugs. Defendant said that Mr. Hoover had two beers while they were at Bullfeathers; however, Defendant also stated that he had asked Mr. Hoover if he wanted a second beer and that Mr. Hoover declined because he had to drive back.

Defendant said that he was drinking Blue Moon at Bullfeathers and that the victim had introduced him to it. He stated that, before they went to Bullfeathers, the victim had given him a Blue Moon in a glass with an orange slice. Defendant stated that he paid $60 in cash for the tab at Bullfeathers. Defendant remarked that he did not know the victim's family and that the only person he and the victim both knew was Mr. Jack. Defendant stated again that he would call Mr. Jack every time the victim "did this," which was often. Defendant commented that he worried about the victim and that, in Indiana, the victim would send him a photograph from a bar every night.

Detective McCord testified that he had reviewed the Bullfeathers surveillance recording and that the victim talked to anyone around her and did not spend time with any group or person in particular. He stated that Defendant said he was trying to make the victim upset by telling her that he was going to Indiana a day early, but it "fell by the wayside." Detective McCord said that Defendant smoked at the crime scene "every opportunity he could."

Detective McCord conducted a third interview with Defendant at the crime scene outside on a cul-de-sac, which was recorded by his body camera. A recording of the interview was received as an exhibit and reflected that Defendant, Detective McCord, and two other officers were standing outside a police cruiser. Defendant averred that the victim was alive when he left the previous evening. Defendant denied that he hurt the victim during their argument or that she was packing her things to leave. Defendant noted that he had spoken to Mr. Jack, who told him that the victim called her mother at about 12:33 a.m. Defendant denied that the victim had any head injuries or that anything happened between them physically. Defendant denied that they had any guns in the house; he added that he kept a small pistol in his truck for protection and that he did not carry it. Defendant said that he left in Mr. Hoover's white truck and that his primary cell phone might have fallen out of his pocket inside it. Defendant stated that, when he left, the victim was smoking marijuana in the garage, that he left through the garage door, and that the victim closed the door behind him.

Defendant denied that the victim ever told him she was leaving, and he noted that it was not "that type of argument." Detective McCord described a message the victim sent to a friend stating that she was packing up and leaving. Defendant maintained that the

argument was over the victim's wanting to stay at Bullfeathers or go back there. Defendant stated that, at Bullfeathers, he was whistling while the victim sang a karaoke song when a man aggressively "got over in [his] face" and told him to stop whistling. Defendant said that, later, the same man and the victim sang two songs as "a duo." Defendant stated that he did not know if that meant anything. Detective McCord told Defendant that he needed to be available to talk to him the following day; Defendant asserted that he was "fully" cooperative.

After a cut in the video, the recording resumed with Defendant's stating that the victim told Mr. Jack "all the time" that Defendant was verbally abusive; Defendant noted, "[A]ll I do is don't say anything, like I shut down when she . . . speaks and yells and screams[.]" Defendant denied that he called the victim names. He added, "I was married to the same woman fifteen years, I never hit her." Defendant denied that he had ever had an order of protection against him. Defendant stated that he had previously received speeding tickets.

Defendant asked Detective McCord again if the victim had been shot; Detective McCord repeated that they did not know yet but that evidence in the house indicated there should be a firearm inside. Defendant stated that the victim had a BB rifle. Defendant denied that his or the victim's cars backfired, but he noted that Mr. Hoover's truck was loud. Defendant said that Mr. Hoover dropped them off, that Defendant asked him to come back, and that Mr. Hoover arrived about twenty minutes later.

Defendant stated that, in the interim, he saw a black Ford F150 truck parked near the house with tinted windows. Defendant said that the truck had its parking lights illuminated but not its headlights and that, by the time Mr. Hoover arrived, it was gone. Defendant repeated that the victim was smoking in the garage and added that the last thing she said to him was, "Have fun."

Defendant stated that he was "under a load" to transport goods to Chicago on Monday, although he did not think he could drive under the circumstances. He repeated that he needed to talk to someone. Defendant said that, one week previously, the victim had been "beat up" by a man named Danny with whom she had been in a relationship for six months. He stated that Danny had broken the victim's television and caused damage inside their home. The victim called Defendant and told him that she had called the police and that Danny had left. While they were speaking, she told Defendant that Danny had pulled into the driveway and hung up abruptly. Defendant called Mr. Jack and told him to call the police and go to the victim's residence; Mr. Jack was fifty minutes away, and Defendant noted that he was panicked for three hours over the victim's safety. He said that he was "expecting the worst then." Defendant stated that Mr. Jack did not think Danny would have driven to Knoxville. Detective McCord observed that the house had no signs of a break-in.

When asked what firearms he had purchased previously, Defendant stated that he bought a .38 caliber pistol from a friend who needed money, that he had three rifles, and that he had the derringer he kept in his semi-truck. Defendant noted that he had sold a .45 caliber pistol previously.

When asked by one of the other officers why the victim would have wanted to leave, Defendant responded that it was "news to [him]" and maintained that their argument was not that serious. Defendant denied that the victim was packing the car when he left. He stated that, when they moved her to Knoxville, the victim's car was "jam-packed" with belongings and that he towed her car because she did not want to drive it. Defendant stated that some clothing was left in the backseat of the victim's car and that the victim had wanted him to wash the clothes because they smelled like smoke or marijuana.

When asked why the victim would have told people she was leaving, Defendant responded that he did not know. Defendant stated that the victim became "manic" when she drank too much. Defendant denied again that the victim told him she was leaving. Defendant said that it was hard to explain but that it was not an argument "like that." Defendant stated that the victim wanted to go back to the bar and that he told her to go ahead. Defendant walked with Detective McCord to the driveway and described that Mr. Hoover pulled the blue truck onto the left side of the driveway, leaving tire tracks in the mud to the left of the driveway; the recording showed the blue truck on the right side of the driveway. Defendant said that Mr. Hoover later pulled up to the curb in his white truck behind the driveway. Defendant noted that he felt, but did not know, that the victim had moved the blue truck. Defendant stated that, two weeks previously, the victim had left him at a hotel between 12:30 and 2:00 a.m. while she went out; she came back at 2:00 a.m. to ask him to come out to the club with her. He said that he felt sorry for the victim and "put up with it."

Defendant noted that Mr. Hoover had arrived at the scene driving his father's car instead of the white truck. The recording ended with Detective McCord asking to speak to Mr. Hoover alone.

Detective McCord testified that he kept within eyeshot of Defendant while he interviewed Mr. Hoover. Detective McCord stated that he did not have enough evidence that day to support an arrest.

Relative to the Bullfeathers recording, Detective McCord testified that he was unsure if the jacket Defendant wore in it was ever located. He could not tell what Defendant was wearing under the jacket. He stated that officers went to Bullfeathers the next business day and that Defendant's cell phone was not found. Detective McCord noted that the surveillance recording did not show Defendant dropping it or leaving it behind.

Detective McCord stated that, on January 27, 2020, Defendant "presented himself" at the police station in Knoxville's City-County Building. Defendant conveyed that he was afraid for his life and wanted to speak to detectives. Detective McCord stated that Defendant "came in with some type of note that had the language 'Your next' written on the note."

Detective McCord conducted a fourth recorded interview, which was received as an exhibit. Detective McCord stated that another detective accompanied him in the first part of the interview and that Lieutenant Steven Sanders was present in the latter part of the interview. The interview took place over three and a half hours. In the recording, Detective McCord informed Defendant that he was still under advisement of his *Miranda* rights. Defendant stated that he had been to the Missoula Way house that morning to let Simba outside and feed him. He said that he backed into the driveway in a GMC work truck and that, upon exiting the truck, he saw a note in the truck's passenger seat reading "Your next." He placed the note in a bag and brought it to the police department.

Relative to the note, Detective McCord and, later, Lieutenant Sanders reassured Defendant that the note would be investigated; Detective McCord discussed that, even if Mr. Jack or the victim's family left the note, he did not believe they would "do anything." Detective McCord also told Defendant that the note had been written in lipstick and that it was "not genuine." Nevertheless, Defendant repeated more than a dozen times that he was afraid for his life if he was not in jail and that the only way to secure his wife and children's safety was to confess to killing the victim. Defendant asserted, however, that he did not, in fact, kill the victim.

Detective McCord told Defendant that he had just left the victim's autopsy and that witnesses in the neighborhood had reported that a white truck was in front of the Missoula Way house when a loud pop or bang occurred and that the truck left a few minutes later. Detective McCord opined that the victim had died close to the time Mr. Hoover initially dropped them off. Detective McCord asked Defendant to help him find the gun, and Defendant responded, "It was a gun?"

Detective McCord stated that Mr. Hoover was trying to protect Defendant but that if Detective McCord had to "break" Mr. Hoover, he would charge him with "accessory after the fact." Defendant said that Mr. Hoover had "nothing to do with this." Defendant stated that Mr. Hoover never exited his truck when picking up Defendant.

Defendant reiterated at least six times during the interview that the victim never said she was leaving or that he did not know she was leaving. Defendant said that he did not know who killed the victim, that the victim was on the telephone with her mother, and that the victim was smoking marijuana when he left.

Defendant stated that, "honest to God," he had not fired a gun in a long time. He noted, though, that he recently found a bullet in Indiana, pulled it apart, and lit the powder on fire to see what happened.

Defendant said that the victim's last words to him were, "Have fun." He stated that the victim was "going back and forth" like she wanted to go back to Bullfeathers. Defendant said, "I can admit to you and tell you that I did it, but deep down inside I didn't, but I want to tell you I did, just so I don't have to go back out there."

When discussing the argument he had with the victim, Defendant stated several times that it "wasn't that kind of fight" and that the victim simply wanted to go back to the bar. Defendant stated that he told the victim to stay at Bullfeathers and did not force her to leave. Defendant stated again that he wanted to admit to the killing but then denied that he had a gun.

Defendant stated that he stayed in Middlesboro the previous evening because he was "in fear that somebody, that they know my address" in Harrogate. He noted that he had sent his wife a text message from his iPad, informing her of his plan to admit to the killing to "be done with it" for the sake of their safety.

Defendant denied that he had a gun, but later added that he had a small derringer that evening. Defendant stated that he did not carry the derringer and that it was never inside the house. When asked whether he tossed the gun off of the Missoula Way house's back porch, Defendant answered negatively. Defendant said that he had "never harmed anybody." Detective McCord asked Defendant again where the gun was located. Defendant stated that no gun was ever in the Missoula Way house, that they had only been there one week, and that any "bang" did not happen when he was at the house. Defendant claimed that the victim was still alive when he left. He noted that Mr. Jack said the victim called her mother around 12:30 a.m., and he averred that he and Mr. Hoover had left the house by 12:00 a.m. Detective McCord interjected that Defendant's time frame was "off" and that he was outside the house at 1:00 a.m.

Defendant asked if the police had checked the location data on his cell phone. Detective McCord asked for the location of Defendant's other cell phone, and Defendant stated that it had to be at Bullfeathers. Defendant denied that the phone was in Mr. Hoover's truck. Defendant stated that he called Mr. Hoover after being home with the victim for about ten minutes and that Mr. Hoover was only fifteen minutes away.

Defendant commented that he understood that he was the last person seen with the victim and that he was "to blame." He noted that the situation did not "look good" and stated, "But I promise you, I did not kill her." Defendant stated that, when he opened the garage door, the victim was smoking marijuana while sitting on the furniture boxes.

Defendant continued, "I don't want to leave here. I could just admit to this, but in all honesty, I didn't do this."

When Detective McCord admonished Defendant to honor the victim by telling the whole truth of what occurred, Defendant asked if Detective McCord thought that Mr. Jack left the note. Defendant denied ever laying hands on the victim and stated that their argument consisted of "snarky" comments. Detective McCord stated that the victim had told people that she was leaving. Defendant replied, "All I know is, she's into a lot. I don't know what she's into. The way she talks about some of her past, it gets me thinking[.]" Defendant stated, "There was no accident.[5] There was no premeditated . . . . I didn't kill anyone."

Defendant said that the victim was a good person. When asked why the victim was dead, Defendant stated, "Apparently someone shot her." He denied killing the victim. Defendant stated that he had never cursed at the victim, although he called her "something" one time. He noted that they had only been together for three or four weeks.

Detective McCord stated that the blue truck had probably been moved so that the victim could leave in her car. Defendant noted that the victim must have moved it herself because Mr. Hoover had parked the blue truck on the left side of the driveway. Defendant stated that he did not sleep the previous night. Defendant asserted that he had told Detective McCord everything he knew. He stated that he had not fired a gun in six months to a year.

When Detective McCord opined that Defendant was showing little emotion, Defendant responded that he was in shock. Defendant stated, "All I've got to tell you is the truth. I wouldn't lie about something." Defendant noted that he had allowed the victim to "walk[] out" a couple of times. Defendant did not know why the victim was carrying clothing. He noted that he was supposed to take the clothes in the victim's car to the laundromat and that they smelled like marijuana. Defendant stated that, on Saturday, January 25, he had taken three loads of laundry that were set out in the house and forgot the clothes in the car. He denied that an argument occurred because of his error.

When asked why the victim did not stay at Bullfeathers, Defendant stated that he did not know and that normally she would have stayed. He said that he told her that he needed to take Mr. Hoover back to the house, that he did not tell her to come with them, and that he gave her the option to stay. Defendant stated that the victim sang one more karaoke song and then left. He said that the victim sat behind him in the truck and made it known that she wanted to go back. According to Defendant, he told her, "That's fine, you can go back."

_____

[5] Detective McCord had suggested earlier in the interview that the shooting was accidental.

Defendant said that they returned to the house and argued about "nothing major" for "a minute." Defendant averred that the victim stated that she was going back to Bullfeathers and that there was a man there, which was meant to make Defendant jealous. Defendant denied that he was the "jealous type." Defendant stated that he, in order to "fire back," started talking about a fictitious girl in a black shirt he had seen at the bar. Defendant stated again that the last thing the victim said to him was, "Have fun." He said that she was smoking in the garage and that he stood outside to wait for Mr. Hoover. Defendant stated that the garage door was open and that he had walked in and out at one point during the argument. Defendant stated that he and the victim did not know each other well enough to know how to antagonize one another. Defendant said that the victim's previous occupation did not bother him, and he denied asking her to quit. When Detective McCord stated that a "rage situation" would have created damage to the Missoula Way house, Defendant replied, "I don't know what to tell you."

Defendant said that he wanted to confess but that he wanted the victim's parents and Mr. Jack to know that he did not kill the victim. Defendant repeated twice that he did not kill the victim. When asked why he wanted to confess, Defendant responded that "they" knew where he lived. He stated that his wife knew he was involved with another woman and was getting a house with her. Defendant claimed that his wife was seeing another man and remarked, "Wouldn't I kill him if I was going to kill someone?"

When Detective McCord described Defendant as "head over heels" in love with the victim, Defendant stated that he "wasn't completely" in love with her. He stated that he loved the victim and was "trying to learn her" but was not "in love" yet. Defendant asserted that his story had not changed and that he had not "lawyered up yet" because part of him wanted to go to jail. He noted that he would "say it" and that it would all be over. Defendant indicated that he was willing to take a polygraph examination. Defendant noted that he had "never done this before" and that he worried too much. He stated that he understood and sympathized with the victim's family's and Mr. Jack's frustration.

Defendant stated that, yesterday, he felt like he knew who killed the victim. He stated that the victim only had her cell phone for one week and that Danny had taken the victim's old cell phone, which had been deactivated. Defendant stated that the phone might contain messages from a man named David, who was one of the victim's "regulars" at the club. Defendant stated that, when the victim told David she was moving, he offered her $500 to $700 for her to have lunch with him, which she did. During lunch, the victim became angry and left but did not block David's telephone number. Defendant stated that David sent the victim long messages, which may have been threatening, and that the victim was keeping him "on the side" in case she went back to her job.

When asked what the pop or bang at the Missoula Way house was, Defendant denied that the sound occurred. He stated that they did not throw or break anything. He

characterized the argument as a verbal confrontation and noted that he "g[o]t over that kind of stuff quick." Defendant noted that the victim had his focus all night at Bullfeathers.

Defendant stated again that his wife was seeing someone; he asserted that he "threw away" his family three years ago when he went to the same adult club in Indiana and cheated on his wife with an unrelated woman. Defendant acknowledged, though, that he and his wife had renewed their vows in August 2019 and had not been separated. Defendant stated that he left his wife one month ago, but he denied that he was really "with" the victim.

Defendant remarked that he thought Mr. Jack was "making things up" to frame him. Defendant stated that there was a possibility the victim was taking her clothes to another closet. Defendant stated that he did not lock the front door when he left but that it was locked when he returned in the morning. He remarked that the front door handle was locked but not the deadbolt. When Detective McCord noted that Defendant said that he had left through the garage, Defendant responded that he went in and out of the garage several times, that the victim closed it behind him on one occasion, and that he came back in through the front door.

Detective McCord told Defendant that the victim had sent messages to Mr. Jack indicating that Defendant had gotten agitated and angry when she had not wanted to have sex. Defendant denied that the victim ever declined sex.

Detective McCord stated that Defendant was a coward who would not "say it." Defendant responded, "I did it. I did it. There you go." Detective McCord asked for details and noted that Defendant's wife had told him "about the guns." Defendant stated that he had one gun in the kitchen cabinet in his house in Harrogate; he did not know what kind of gun it was, and he noted that he bought it from a friend who needed money. Defendant also stated, for the first time, that he had inherited a .32 caliber pistol from his grandfather. Defendant claimed to have forgotten about his grandfather's gun. Detective McCord and Defendant had an exchange about whether he had a gun; Defendant denied having had a gun on the night of the shooting, and Detective McCord stated that Defendant's wife had said he would "talk circles" and make everyone else out to be the liar.

Defendant stated, "I just told you I did it. I'm going to jail." Detective McCord gave Defendant a piece of paper and instructed him to write where the gun was. Defendant denied having had a gun, and Detective McCord took away the paper. When asked how he killed the victim, Defendant stated, "I did it. You were right, she was leaving, I panicked, I shot her." Detective McCord stated, "This is really cute," and he told Defendant that he needed to tell the truth. Defendant said that his wife could verify that two guns were in the kitchen cabinet at the Harrogate house and that he did not have any

others, apart from the derringer. Defendant stated, "I'm admitting to this. Let me admit to it." Detective McCord responded negatively, and Defendant stated again that he was admitting to it. Detective McCord stated that Defendant did not do it, and Defendant responded, "You know I didn't."

Detective McCord again asked for details, and Defendant stated that they did not argue "like that." He said that he was angry with the victim for having lunch with David. When Detective McCord asked what they argued about on the night of the victim's death, Defendant repeated that the victim never told him she was leaving. Detective McCord asked Defendant where he shot the victim, and Defendant responded "in the hallway" and "in her head." Defendant said that he did not remember what he did with the gun. Defendant stated that he did not kill anyone, then remarked that he was "just trying to tell [Detective McCord that] [he] did it."

When Detective McCord remarked that Defendant and the victim were not "happy go lucky" at Bullfeathers, Defendant asked who told him that; he stated that nothing happened there and that the victim was not upset with him. Detective McCord noted that Defendant "play[ed] the victim," and Defendant responded, "I'm about to be." Defendant stated that he told his wife last night that he was going to confess. He asked about the possibility that someone other than Mr. Jack wrote the note.

Detective McCord asked Defendant why he did not have a key to the Missoula Way house. Defendant stated that the victim had just had keys made, that they had been using the victim's keys, and that he did not know where his set of keys were located. He noted that he could not contact the property manager because he had no cell phone.

Defendant noted that he paid for his parking spot downtown for twenty-four hours so that someone could pick up his truck after he confessed. He stated he did not care if he was "taking the fall" for someone else. Detective McCord stated that he would not arrest the wrong person because that was not justice for the victim. Defendant stated that the victim knew he loved her and that, if he left the police department, he would "do something" to be arrested because he was "paranoid as hell."

Detective McCord discussed that the victim had told others that Defendant would notice things and "get on her" about them. Defendant stated that he recalled some arguments about the victim's hiding messages from him. He opined that it was "typical twenty-five year old with a thirty-three year old" and that it was nothing to yell or curse about. When asked if he was emotionally prepared for his relationship with the victim, Defendant responded negatively, and he added that the victim "brought out something in [him] that [he] hadn't felt in a long . . . time."

- 35 -

Defendant stated that the victim found out he was married with children before he moved her to Knoxville. He said that the victim was "fine with that" and loved him enough to look past it. Defendant stated that he asked his wife for a divorce two weeks ago. Detective McCord stated that, according to Defendant's wife, the past two years of their marriage had been great. Defendant replied that he had learned to pick his battles and let things go and that they did not fight or argue anymore. He stated, though, that three years ago, his wife slept with their neighbor and that he had also cheated on his wife. Defendant said that his wife forgave him but that he could not get past her infidelity and did not love her after that.

Detective McCord asked, "If you didn't kill her, who did?" Defendant replied that he killed the victim. Detective McCord asked if Defendant killed the victim. Defendant responded affirmatively and added that his wife told him only to admit to something he did. He stated that the only reason to confess was to protect his children. Detective McCord said that this was not how things worked and that he needed details. Defendant stated, "I told you, she was leaving. She was in the hallway, and I shot her. In the head. I didn't want her to leave." He added, "Don't let me leave here. Please don't." Defendant stated that the victim was "the only one that honestly knows what happened." He repeated that the victim was involved in "a lot of stuff" that seemed bad to him. Defendant stated that the victim had a dealer for pills and another for marijuana, which was "stuff [he was] not accustomed to." He noted that the marijuana dealer was going to mail marijuana to the Missoula Way house.

Detective McCord asked Defendant if he recalled drunkenly calling his wife on Saturday night and why he failed to tell him about it. Defendant stated that he remembered the call but that he did not think to mention it. He said that he called his wife and asked to stay on the couch, that she declined because her mother was visiting, and that he dropped the subject. Defendant stated that he knew Mr. Jack and the victim's friends would think that he killed her.

Defendant stated that he told the victim he was leaving and that they would talk tomorrow; she closed the garage door behind them. Defendant noted that both of them thought the other one was going back to Bullfeathers, although he did not know if the victim left the house. Defendant stated that the police would have to check his cell phone to see when he called for an Uber rideshare driver. Defendant said that he also called Mr. Hoover, perhaps twice, to ask for a ride. Defendant stated that he went back inside to get a beer and that, when he left the second time, the victim was smoking marijuana while sitting on the furniture boxes, and her marijuana-related materials were on the hood of her car. She told Defendant, "Have fun," because he had given her the impression he was going to Bullfeathers. Defendant stated that the victim would usually open the garage door when she was smoking. He said that, one of the last times he left the house, he used the front door.

Defendant stated, "I want to admit to this. Nobody's going to believe me." Defendant commented that he thought Mr. Hoover believed he killed the victim because he had texted Mr. Hoover asking to talk, but Mr. Hoover kept making excuses and avoiding him. Defendant stated that he had wanted to say goodbye to Mr. Hoover but that he told Mr. Hoover he was going to admit to the killing and relayed his opinion that he and the children were in danger. Defendant said that Mr. Hoover told him to tell the truth, and everything would be okay.

Detectives McCord and the second detective left Defendant alone for a period of time; Detective McCord returned with Lieutenant Sanders, who asked Defendant for the whole story from the beginning. Defendant stated that, on Saturday, he and the victim went to a bar in Turkey Creek beside a beer store; they had a few drinks, then bought two six-packs of beer at the beer store before returning to the house. Both of them showered and got ready. Defendant called Mr. Hoover to come down, meet the victim, and get a drink. While they were at Bullfeathers, Mr. Hoover reminded Defendant that he needed to get up early the next morning. Defendant said that he told the victim they needed to go, that she did not want to leave, and that she agreed to leave after she sang one more song. The trio left, and Mr. Hoover dropped them off at the house. Defendant stated that he called Mr. Hoover to come back and get him. Defendant stated that he and the victim argued, that she wanted to go back to the bar, that she brought up a man at the bar, and that Defendant told the victim he was going back to a different bar to make her jealous. Defendant said, "She said she was leaving, and I didn't want her to leave so I shot her."

When asked to describe the argument, Defendant stated that they were "enticing" and "p---ing each other off" with words. Defendant said that the victim was "walking toward the door, and I pulled out a pistol, and I shot her." He said that he shot the victim in the "head area" while she was between the "first bedroom" and the laundry room and that he stood behind the couch. Defendant did not remember the kind of pistol he used. When asked from where he got the gun, Defendant responded, "You mean where did I hide it?" Lieutenant Sanders clarified that he was asking where Defendant kept the gun, and he responded that he kept it under the bed.

Defendant stated that he threw the gun "in the lake," which "might be a river." Defendant said that he could not take officers to the location because he was drunk at the time he threw it away. Defendant stated that he took a beer and the gun with him when he left the house and that Mr. Hoover did not know about the gun. Defendant said that, after Mr. Hoover dropped him off at his semi-truck, he drove "down the valley" on Interstate 75 South and threw the gun out of the window. Defendant stated that he also drove on Highway 63, Interstate 640, and Highway 33. He said that he parked at Kay's Market in Maynardville at about 5:30 or 6:00 a.m. and slept. Defendant stated that he woke up and returned to the Missoula Way house and described calling the police and the first responders' entry into the house.

When Lieutenant Sanders discussed the "Your next" note, Defendant stated, "But I feel like I deserve it. In a sense." He said that he brought the victim "down here" and that, if he had not "gone to this club this wouldn't have happened." He stated, "[I]t's my fault anyway." Lieutenant Sanders stated that a false confession was not justice for the victim, and Defendant responded, "But I'll end up dead." Defendant noted that he believed, and that he had told Mr. Hoover, that he would also be dead if he had not left the Missoula Way house. When asked what he was carrying in his hands when Mr. Hoover picked him up, Defendant said nothing.

In response to further reassurances regarding his safety, Defendant stated that there was "no help" for him, that he did not have enemies before, and that he was unsure why the victim had enemies because the victim did not let him "too much inside." Defendant acknowledged that the threat to his family could be "in [his] head." Defendant noted that the victim's friends and mother knew his address because Mr. Jack had run a background check on him. Detective McCord asked what Mr. Hoover took from Defendant because he was intoxicated and upset, and which he returned to Defendant once they arrived at his semi-truck. Defendant said that Mr. Hoover did not take anything from him.

Defendant subsequently signed a consent form to search his GMC truck; Defendant noted that Mr. Hoover usually drove it because he did not have a CDL. Defendant told the officers that his iPad was inside underneath a mattress in the truck, and he gave them its passcode. The officers placed Defendant under arrest.

Detective McCord testified that Defendant's "back and forth" between admitting guilt and stating that he did not kill the victim was frustrating. He stated that Defendant mentioned "very regularly" that the victim used marijuana and that Defendant consistently said the victim's last words to him were, "Have fun." Defendant never provided a more specific description or took police to a location where he disposed of the gun. Detective McCord stated that they attempted unsuccessfully to pinpoint a location using Defendant's statements in order to deploy the "underwater recovery team." He noted that there was also an indication that the gun could have been thrown out along the interstate.

Detective McCord stated that, aside from the victim's leaving him, Defendant never provided an inciting action on the victim's part to provoke the shooting. Detective McCord did not think Defendant described the quarrel as sudden.

A TBI forensic biology report was received as an exhibit, and Detective McCord testified that the cigarette butt under the victim's hair contained Defendant's and the victim's DNA and that Mr. Hoover was excluded as a contributor. The report also reflected that swabs taken from between the victim's leg and the wall and on the wall beside the victim tested as the victim's blood. The cigarette butt collected from the kitchen floor contained Defendant's DNA.

Detective McCord stated that Defendant consented to have the derringer seized and that the police collected firearms belonging to Mr. Hoover's father to which Mr. Hoover had access. Detective McCord said that fingerprint testing did not yield any useful results.

Detective McCord testified that photographs from the victim's phone taken on January 25, 2020, showed items on shelves in the living room that had been removed by the time the crime scene was secured; he noted that one shelf had contained a case purported to contain a firearm, which was never located. He said, however, that items on the coffee table and the clothing in the recliner remained the same as in the photographs from the victim's phone. Additional photographs showed the victim's outfit that evening, Defendant and Mr. Hoover, and the dancing man at Bullfeathers.

Detective McCord testified that the victim's call log reflected a call at 11:55 p.m. to a contact labeled "Dylan," which lasted six minutes and forty-five seconds, and that the final incoming call the victim answered was from a contact labeled "Mommy" at 12:26 a.m., which lasted nineteen seconds. At 1:45 a.m., the victim's phone received an unanswered call from a contact labeled "Babes Other Phone," which was later identified as the phone number corresponding to Defendant's work cell phone, and the phone received unanswered calls and texts from Defendant and Mr. Hoover.

Detective McCord testified that Defendant's internet searches on his cell phone were as follows: the address of the Missoula Way house at 11:26 p.m. and 1:23 a.m.; "Feather Bar" at 1:25 a.m. and 2:37 a.m.; and "Police near me" at 11:11 a.m.

On cross-examination, Detective McCord testified that a swab from Defendant's blue pickup truck was negative for bodily fluids, including blood. Detective McCord did not recall specifically looking for the jacket Defendant wore to Bullfeathers, but he did not think they found one. Detective McCord said that, according to Defendant, he came in for a beer after making two telephone calls to Mr. Hoover to pick him up, and the victim told him, "Have fun." Defendant also told Detective McCord that the victim's last words were to "indicate[]" she was leaving, that he panicked, and that he shot her.

Detective McCord stated that he did not compare the cigarette butts with the unused cigarettes in the various packs at the scene. He agreed that cigarettes were also found in the victim's car. He stated that it was common for peoples' DNA to be present on items in their home. Detective McCord acknowledged the possibility that the victim had Defendant's DNA on her, and he stated that he did not know how the DNA came to be on the cigarette butt underneath her hair. He said that DNA could last on a surface for hours or days.

Detective McCord testified that he met Defendant hours after the victim's estimated time of death and that Defendant had no injuries or torn clothing suggesting he had been

in a fight. He said that Defendant's eyes were bloodshot, which was consistent with drinking alcohol or not having slept. Detective McCord testified that Defendant had difficulty focusing and that, throughout the multiple interviews, Defendant's answers to questions were not responsive and sometimes irrelevant. Detective McCord did not know if Defendant was in shock, although he acknowledged Mr. Jack's testimony that Defendant sounded as though he was in shock. Detective McCord stated that Defendant said, "I don't know if I can do this," and that Defendant needed someone with whom to talk. He noted that he had intended to provide Defendant with information on psychological resources.

Detective McCord testified that Defendant initially denied knowing how the victim was shot, that Mr. Hoover confirmed his story of being picked up, and that no evidence indicated Defendant was the shooter at that time. He agreed that Defendant came to the police unprompted to confess. Detective McCord testified that Defendant offered "lame" and unbelievable explanations of what happened, and he agreed that he "worked through those issues" and "got [his] confession." Detective McCord said that he could not explain why Defendant confessed in the manner in which he did. Detective McCord did not ask Defendant, Defendant's wife, or Mr. Hoover about Defendant's mental health. He did not know at the time of the interviews whether Defendant had past trauma or post-traumatic stress disorder. He did not recall discussing that Defendant was in special education classes in school, and he did not ask anyone if Defendant had a learning disability. He stated that, although "it was a difficult series of interviews," Defendant "spoke normally" to him and that he had no difficulty understanding Defendant.

Detective McCord did not recall if he or other officers spoke with Defendant on the telephone. He stated that, in each interview, Defendant wanted to talk, declined an attorney, and cooperated with searches of the house, his trucks, and his electronic devices. Detective McCord had no reason to believe that Defendant deleted data from the cell phone he gave to police. Detective McCord agreed that they knew of Mr. Hoover because Defendant identified him and called him for Detective McCord. Detective McCord agreed that Defendant did not have to return to the Missoula Way house and that he had a planned trucking run to Chicago. Detective McCord also agreed that Defendant chose to remain in the area and that Defendant was the first one to call the police, unlike Mr. Hoover. Detective McCord testified that Defendant's call log reflected that he called Mr. Hoover at 11:54 p.m. on January 25, which was after they left Bullfeathers but before the victim called Mr. Jack.

On redirect examination, Detective McCord testified that Defendant's call log reflected a thirty-two-second call to Mr. Hoover at 12:11 a.m. on January 26. Detective McCord testified that the last text message sent from the victim's cell phone was sent at 12:39 a.m. on January 26.

### C. Expert testimony

Knox County Chief Deputy Medical Examiner Dr. Christopher Lochmuller, an expert in forensic and anatomic pathology, testified that he performed the victim's autopsy. He stated that the cause of death was a gunshot wound to the head, and the manner of death was homicide. Dr. Lochmuller removed one bullet from the victim's body. Dr. Lochmuller said that the bullet entered the left back side of the victim's head, traveled through the brain, causing significant injury, hit the first cervical vertebra, and bruised the spinal cord before coming to rest inside the victim's mouth adjacent to the right side of the jaw. Dr. Lochmuller stated that the range of the gunshot was indeterminate, that no soot or stippling was present, and that the victim's thick hair could have acted as an intermediary target.

Dr. Lochmuller testified that he would have expected the victim to have collapsed or fallen to the ground because the injury would have "stunned [the spinal] cord where she couldn't . . . perform any voluntary movements." He stated that the injury was "highly unlikely" to be survivable. Dr. Lochmuller testified that, as documented by the autopsy photographs, the victim's hands were uninjured.

On cross-examination, Dr. Lochmuller testified that there were no signs of a struggle on the victim's body. He stated that the victim's toxicology reflected that she had alcohol, marijuana, and two marijuana metabolites in her blood. Dr. Lochmuller testified that the victim's blood alcohol content was .081 and that the legal limit to drive in Tennessee is .08.

Former TBI Special Agent forensic scientist Kyle Osborne, an expert in microanalysis and GSR testing, testified that Defendant's swabs tested positive for GSR. Mr. Osborne stated that GSR remained on a person's hands for six to eight hours, although washing one's hands could remove it. He stated that GSR was deposited on the skin by firing a gun or handling a gun or spent ammunition. Mr. Osborne noted that it was standard procedure not to test swabs from the victim of a gunshot wound because GSR particles could travel "down range."

On cross-examination, Mr. Osborne stated that, if Defendant admitted to shooting the victim, it was unsurprising that he had GSR on his hands. He agreed that the presence of GSR gave no other insight into the case.

KPD Sergeant Brian Dalton, an expert in forensic firearms and tool mark examination, testified that he examined the shell casing recovered from the crime scene. Sergeant Dalton stated that the shell casing was a 9 mm Luger Remington Peters brand. He noted that a teardrop-shaped mark "created by the breech face aperture" and a "faint line going through the center of the firing pin impression" led him to conclude that the

casing was fired by a Smith & Wesson M & P series firearm. Sergeant Dalton's report listed six possible Smith & Wesson models. Sergeant Dalton testified that a newer Smith & Wesson firearm would have a plastic case; he stated that he had seen solid black and gray boxes as well as blue with a gray hinge. He agreed that a blue box in a photograph from the victim's cell phone was consistent with a Smith & Wesson case, and he noted that one of the boxes in his "reference collection" had the same colors. Sergeant Dalton detailed the steps to load and fire a gun. Sergeant Dalton stated that there was nothing to indicate that the shell casing was fired in the wrong size of gun. He stated that, relative to the M & P series, only some models had a manual safety; he noted, though, that all would have internal safeties, trigger safeties, and firing pin blocks built in to prevent accidental firing.

### D. Electronic evidence

KCSO cyber technician Stephanie Van Winkle testified that she performed data extractions on two iPhones belonging to Defendant and the victim, respectively, as well as Defendant's iPad. Ms. Van Winkle stated that another agent analyzed the victim's phone because it had a passcode. Ms. Van Winkle identified Facebook Messenger chats and text messages between the victim and Defendant, text messages between the victim and a person named "Cher," photographs from the victim's phone dated January 25, 2020; the internet search history and call log from Defendant's phone; and messages from Defendant's iPad using an email address, GMCtruck07@outlook.com, sent to a telephone number with the last four digits of 1681.[6]

The victim's call log reflected the following calls on January 25 and 26, 2020: outgoing calls to Ms. Polk at 11:45 p.m. and 12:25 a.m.; an unanswered incoming call from Ms. Polk at 11:54 p.m.; an outgoing call to Mr. Jack at 11:55 p.m.; an answered incoming call from Ms. Polk at 12:26 a.m.; unanswered incoming calls from Defendant's work cell phone at 1:34 a.m., 1:35 a.m., 1:36 a.m., 1:50 a.m., 2:20 a.m., 2:21 a.m., 2:23 a.m., 9:48 a.m., 9:58 a.m., and 10:16 a.m.; unanswered incoming calls from Mr. Hoover[7] at 1:37 a.m., 1:44 a.m., and 1:49 a.m.; and four unanswered incoming calls from Mr. Jack beginning at midmorning on January 26.

The victim's cell phone extraction report reflected the messages exchanged between the victim and Defendant's work cell phone. Defendant sent picture messages of a cartoon man at 9:50 a.m. and 9:51 a.m. on January 26, 2020; one of the cartoons had a message bubble reading "u there?" Defendant also sent messages reading, "Kelsey," "I'm sorry, please call me," and "I don't wanna argue," at 9:59 a.m.

---

[6] She stated that the timestamps on the reports were in Coordinated Universal Time (UTC), which was five hours ahead of Eastern Standard Time.

[7] Although the telephone number corresponding to these calls was not labeled as a contact in the victim's cell phone, it matches the number labeled in Defendant's cell phone as "Opie," as reflected in his call log.

Photographs from the victim's cell phone extraction report were received as an exhibit and reflected the following photographs taken on January 25, 2020:

- ° 10:14 p.m.: Defendant at Bullfeathers with a caption reading, "My f--kin MANNNNN," followed by several drooling emojis;

- ° 10:04 p.m.: A "selfie" of the victim and Mr. Hoover at Bullfeathers;

- ° 9:24 p.m.: A selfie of the victim, Mr. Hoover, and Defendant at Bullfeathers;

- ° 8:41 p.m.: The victim hugging Defendant and sitting in Defendant's lap on the living room recliner;

- ° 7:05 p.m.: The living room from the perspective of the sofa, which showed the bottles of crown royal and juice on the coffee table, as well as décor items and a blue rectangular case with a black handle on one of the shelving units near the television;

- ° 6:02 p.m.: The victim in a lingerie top; and

- ° 2:11 and 2:12 p.m.: Selfies of the victim and Defendant, one of which showed a mug of beer.

The victim's cell phone extraction report also reflected the following text messages with a contact labeled "Cher":

| Time sent | Sent by | Text |
| --- | --- | --- |
| 1/25/20 11:37 p.m. | The victim | Hi it's Kelsey. Just givin u my number. Thanks for being a friend. |
| 1/26/20 12:23 a.m. | Cher | If you need anything please reach out to me |
| 12:39 a.m. | The victim | I'm packing up and leaving. |
| 12:53 a.m. | Cher | Oh gosh!!! :( I am sorry! |

Facebook messages between the victim and Defendant reflected that he sent the victim several messages on January 26, 2020, at 1:07 a.m., 1:11 a.m., 1:15 a.m., 1:16 a.m., and 1:17 a.m.; any text in the messages was not displayed in the report. Defendant also sent the victim messages at 10:15 a.m. on January 26, which read, "I'm on my way to the house," "Please pick up," and "I just wanna talk." A message Defendant sent at 10:24 a.m. read, "Kelsey."

Defendant's work phone call log reflected the following relevant calls on January 25 and 26, 2020:

| Time | Incoming call | Outgoing call |
|------|---------------|---------------|
| 8:07 p.m. | | [Mr. Hoover] |
| 11:54 p.m. | | [Mr. Hoover] |
| 12:02 a.m. | | [Mr. Hoover] |
| 12:11 a.m. | | [Mr. Hoover] |
| 12:19 a.m. | [Mr. Hoover] | |
| 12:19 a.m. | [Mr. Hoover] | |
| 12:19 a.m. | [Mr. Hoover] | |
| 12:21 a.m. | [Mr. Hoover] | |
| 12:24 a.m. | [Mr. Hoover] | |
| 12:25 a.m. | [Mr. Hoover] | |
| 1:34 a.m. | | "Mizz Polk"[8] |
| 1:35 a.m. | | "Mizz Polk" |
| 1:36 a.m. | | "Mizz Polk" |
| 1:37 a.m. | | [Defendant's wife] |
| 1:50 a.m. | | "Mizz Polk" |

[8] The contact labeled "Mizz Polk" had the same telephone number as the victim.

| | | |
|---|---|---|
| 2:20 a.m. | | "Mizz Polk" |
| 2:21 a.m. | | "Mizz Polk" |
| 2:23 a.m. | | "Mizz Polk" |
| 4:40 a.m. | | [Mr. Hoover] |
| 4:44 a.m. | | [Mr. Hoover] |
| 4:56 a.m. | | "Mizz Polk" |
| 9:48 a.m. | | "Mizz Polk" |
| 9:48 a.m. | | "Mizz Polk" |
| 9:58 a.m. | | "Mizz Polk" |
| 10:16 a.m. | | "Mizz Polk" |
| 10:16 a.m. | | [Mr. Hoover] |
| 11:11 a.m. | | Knox County non-emergency dispatch |
| 11:24 a.m. | | [Mr. Hoover] |

A printout of messages between GMCtruck07@outlook.com and a telephone number corresponding to the contact labeled as Defendant's wife's first name in Defendant's cell phone reflected the following messages on January 27, 2020:

| Sent by | Text |
|---|---|
| Defendant | I'm going down there and telling them I did it. I'm scared for my life and I'd rather take blame and be in jail than to live like this. I don't know what happened to her all I know is she's into a lot of stuff and if I'm on the outside I'm a target and I don't want you all involved. I'd rather be in jail and know you guys are alright. I love you and I always have. |

| | |
|---|---|
| Defendant's wife | If you didn't do it, then you don't need to be confessing to anything. There will still be a murderer out there to kill other people |
| Defendant | I know that. Your [sic] not understanding. I don't know the situation she was in or anything. They may be after me. And I can't live like that. You know I worry to death over anything anyway. I'd rather be in jail where I'm safe. |
| Defendant | They may have killed both of us had I been there. I'm freaking out. |
| Defendant's wife | You've got kids. Try to think about them for once |
| Defendant | That's what I'm thinking about. If I'm out here they may still look for me. I'd never be around the kids in fear they may be in danger |

KCSO Lieutenant Emily Ayers testified that she was the Intake-Release Coordinator at the Knox County jail, which involved reviewing inmate communications. She stated that each inmate logged in to the electronic system using an assigned identification number and "a PIN number." She identified two emails sent from Defendant's account. The first email was sent on August 22, 2021, and read in part "thet [sic] charged me with 1st degree murder BUT its not first." The second email was sent on December 19, 2021, and read in part, "First degree murder. At worse its manslaughter."

Excerpts from a May 5, 2020 recorded telephone call and an April 19, 2022 video call were also received as exhibits. The telephone call with an unidentified woman was as follows:

Defendant: No, I've never – I've never said anything to Dustin about you. Nobody says, nobody said anything, you know, if I was to talk to Dustin about you, then there would have been other things that I would've said to Dustin. You know, I would've mentioned the fact of, you know, of the gun that Opie has, I would've mentioned other things that I know that have been said, you know what I mean? I've not said anything to Dustin, Dustin doesn't know that I talk to you, because you know if he knows I talk to you, then he

would tell Jesse, and if he tells Jesse, then Jesse's going to put two and two together, so I've never mentioned your name around Dustin.

Unidentified woman ["UW"]:  Yeah, nobody knows I talk to you.

Defendant:  That's what I'm saying.  So.

UW:  Well, he got a new gun, so good luck.

Defendant:  He what?

UW:  He got a new gun yesterday, so good luck.

Defendant:  Do what now?

UW:  He got a new gun.

Defendant:  When?

UW:  Like yesterday.  He got a 45.

Defendant:  How'd he do that?

UW:  He showed—he showed us all pictures of it yesterday.  I don't know.

Defendant:  Showed pictures of it?

UW:  Yeah, his 45 he got.

Defendant:  Why would he have a picture of it?  What, did he take a picture of it on his phone?

UW:  Yeah, and he [unintelligible] look at this new present I got, and he was showing us.

Defendant:  Why in the world would you take a picture of a gun?

UW:  I don't know.

Defendant:  That's stupid.

UW:  Yeah.

Defendant: You ask him what he done with the old one?

UW: Nope, that's the only gun he's got, apparently.

Defendant: Dang.

UW: Yeah.

Defendant: I'm telling you, you need to find out what happened to it.

UW: There's no way. I don't even know where to begin.

Defendant: If there's a way you can find out what happened to it . . . . I mean, I just need to test it, that's all I need. Like who he sold it to, or traded it to, or whatever. That's – that's all I need. That's odd.

UW: Yeah.

Defendant: Who told him we was after it?

UW: Huh?

Defendant: Did anyone tell him we was after it? Or wanting it?

UW: No, not that I know of. Who would've knew?

Defendant: I don't know.

In the video call, Defendant was speaking to an unidentified woman; the video showed his face and chest to his collarbone. Defendant stated, "Every case is different, and my case is not a gang related case, it's not a dispute where I was robbing or anything like that . . . . [I]t was a sudden quarrel which is manslaughter in the State of Tennessee." The video had some background noise, which sounded like other voices, but none of the words from the background voices were intelligible.

After the close of the State's evidence, Defendant chose not to testify. Defendant's proof consisted of two exhibits, which were Defendant's one-year lease for the Missoula Way house and a receipt for the furniture he purchased for the house, including a financing application.

- 48 -

The jury convicted Defendant as charged, and the trial court imposed a mandatory life sentence. After the trial court denied the motion for new trial, Defendant timely appealed.

## II. Analysis

On appeal, Defendant contends that (1) the evidence of premeditation is insufficient; (2) the trial court erred by admitting Defendant's jail telephone calls and emails, which alerted the jury to Defendant's pretrial incarceration; (3) the prosecutor made improper statements during the State's closing and rebuttal arguments; (4) the trial court erred by instructing the jury that destruction of evidence could be considered evidence of guilt only as to the charged offense of first degree murder and by declining to instruct the jury on voluntary manslaughter as a lesser-included offense; and (5) the cumulative effect of these errors entitles him to a new trial.

### A. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his conviction, arguing that the State failed to establish premeditation. Specifically, he asserts that the State failed to meet its burden of proving beyond a reasonable doubt that he was "sufficiently free from excitement and passion so as to be capable of premeditation." Defendant notes that no evidence was presented of "what actually happened leading up to the shooting" and submits that "the most anyone could possibl[y] conclude would be that he might have been sufficiently free from excitement or he might not have been." The State responds that the evidence is sufficient. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2020). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2020). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2020). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). These circumstances include, but are not limited to:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

*State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (first citing *Bland*, 958 S.W.2d at 660; and then citing *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *Davidson*, 121 S.W.3d at 614 (citing *Suttles*, 30 S.W.3d at 261; *Pike*, 978 S.W.2d at 914).

Viewed in the light most favorable to the State, a rational jury could find from the proof presented that Defendant was sufficiently free from passion as to be capable of premeditation when he shot and killed the victim based upon Defendant's procurement of the weapon; his use of the deadly weapon on an unarmed victim; a lack of provocation by the victim; the nature of the killing; Defendant's failure to render aid to the victim;

- 50 -

Defendant's calmness immediately after the killing; and the destruction or secretion of evidence after the killing. *See Davidson*, 121 S.W.3d at 615; *Bordis*, 905 S.W.2d at 222; *Lewis*, 36 S.W.3d at 96.

The evidence at trial established that, after an interaction between the victim and Defendant at Bullfeathers in which the otherwise effusive victim became subdued, Defendant and the victim argued when they arrived home. Defendant consistently described the argument as not having been physical in nature; Defendant had no injuries when he was photographed by the police; and the house and the victim's body showed no signs of a struggle. Mr. Jack testified that, when he spoke to the victim before midnight, her voice was shaky in a way he had never heard before and that her tone made him afraid. Mr. Jack and the victim discussed her intention to leave Defendant and come back to Indiana that night. The victim also sent a text message to her new friend Cher at 12:39 a.m. that she was packing up and leaving. Mr. Hoover saw the victim's dog Simba in the front seat of her car inside the garage when he picked up Defendant, and police found a large quantity of clothing and plastic totes in the victim's car the following day, as well as baskets of personal items inside the house near the door to the garage. Clothing on hangers on top of the victim's body and her close proximity to the door to the garage indicated that she was carrying clothing to her car when she was shot. Dr. Lochmuller stated that the nature of the victim's injury was such that she would have fallen to the ground immediately and that she would have been unable to move.

Relative to Defendant's procuring a weapon and the nature of the killing, Defendant told the police that he kept the gun under the bed, although a photograph of the living room taken on January 25 showed a case consistent in appearance with a gun case on one of the living room bookshelves. In either scenario, Defendant had to retrieve the gun from its case, prepare it to fire, and shoot the unarmed victim in the back of the head from a far enough distance that no soot or stippling was present on her body. The victim's arms were full of clothing, and it appeared that she was walking toward her car when she died.

Relative to Defendant's demeanor immediately after the killing, Defendant called Mr. Hoover to return to Missoula Way. Mr. Hoover testified that, when he arrived, Defendant came out through the garage and entered Mr. Hoover's truck carrying a beer and the gun case; Mr. Hoover did not think anything was wrong based upon Defendant's demeanor. Defendant eventually became upset twenty-five or thirty minutes later in the Party City parking lot while speaking to his wife. Based upon the testimony, a jury could reasonably conclude that Defendant was calm immediately after the killing. In addition, Defendant left the house after the shooting and, rather than seeking help for the victim, waited until the following morning to call the police.

Relative to the destruction or secretion of evidence, Mr. Hoover testified that Defendant handed him a gun case and that, although he declined to open it, it felt as though

- 51 -

something was inside. Defendant told Mr. Hoover that the gun was loaded and missing one bullet. After Mr. Hoover refused to pull his truck over so that Defendant could throw the gun case off a bridge, Defendant took the gun case with him. After initially denying that he had any guns in the Missoula Way house, Defendant eventually admitted he had one under the bed, and he disclosed to Detective McCord that he threw the pistol into a body of water or out of his truck while driving on the interstate. Defendant claimed to have been too intoxicated to remember details of the location at which he disposed of the pistol, and it was never recovered. Sergeant Dalton testified that the shell casing at the crime scene and the bullet recovered from the victim had marks consistent with a Smith & Wesson M&P series firearm, and he identified the gun case in the victim's photographs of the living room as being the kind and color associated with Smith & Wesson firearms. The jury could reasonably have found that Defendant's destroying or hiding the gun he used to shoot the victim was circumstantial evidence of premeditation.

The only evidence of provocation cited by Defendant during any of his police interviews was that the victim was leaving. As discussed further below, we agree with the trial court that the mere act of stating an intention to leave a romantic relationship and beginning the steps to physically leave the premises does not constitute legally adequate provocation to mitigate culpability for a killing, and the jury could also have appropriately considered the lack of provocation as a factor in favor of premeditation.

Although Defendant was likely intoxicated to some degree, we note that the trial court instructed the jury on intoxication and that the jury's verdict reflects that it found beyond a reasonable doubt that Defendant was sober enough to be capable of premeditation.

Several of Defendant's complaints involve the weight given to various pieces of evidence; however, this court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Relative to the State's closing, the jury was instructed that the arguments of counsel were not evidence, and the jury is presumed to have followed the trial court's instructions. *See State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). Second, an absence of prior planning does not foreclose a finding of premeditation—as stated above, premeditation does not require that the intent to kill preexist in the mind of the accused for any established amount of time. Tenn. Code Ann. § 39-13-202(d) (2020). The evidence was sufficient to support the jury's verdict relative to premeditation, and Defendant is not entitled to relief on this basis.

### B. Jail Communications

Defendant contends that the trial court erred by admitting portions of the two jail emails, the audio-only recording of the telephone call in which Defendant questioned an unidentified woman about Mr. Hoover's gun, and the video chat with an unidentified

woman in which Defendant asserted that he was guilty only of voluntary manslaughter. Defendant argues that, by having the jail custodian authenticate the documents and recordings, the evidence improperly revealed to the jury that he was in custody pending trial such that the jury's verdict was affected. The State responds that the trial court did not abuse its discretion by admitting the evidence.

Before trial, Defendant filed a motion to exclude evidence of his jail calls and emails pursuant to Tennessee Rules of Evidence 401 and 403, arguing that "[t]hese call recordings and copies of emails in their entirety are irrelevant, prejudicial, and cumulative." Defendant argued that the telephone recordings were not relevant and that any probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

At a pretrial hearing, the parties discussed the specific evidence the State intended to introduce. Relevant to this appeal, the trial court determined that a December 19, 2021 email should be redacted except for a passage reading, "First degree murder. At worst it's manslaughter."

When defense counsel requested that the source of the email from "the jail pod" also be redacted, the trial court asked the parties to consider how the emails would be authenticated. The trial court commented, "[A]s I sit here now in order for them to authenticate that and the jail phone calls, it's going to be very clear that he was in custody during this time and that doesn't necessarily deprive the State of the opportunity to put forth that evidence." The prosecutor offered to stipulate to the authenticity of the communications and noted that she did not yet have Defendant's agreement to do so. The trial court asked the parties to discuss it and noted that it was willing to take up the matter again at the parties' request at trial.

Relative to a second email, the trial court found that the following statements were admissible: "Th[ey] charge[d] me with first degree murder, but it's not first. My lawyers are going to fight for manslaughter which is what it is."

The trial court found relative to the video chat showing Defendant and an unidentified woman that the recording should be limited to the following statements: "Every case is different and my case is not a gang-related case. It's not a dispute where I was robbing or anything like that, so. It was a sudden quarrel, which is manslaughter in the State of Tennessee." Defendant requested that the recording be redacted so that it was audio only. Relative to the prejudicial effect of the video portion of the recording, the trial court found,

> I don't find this to be overly prejudicial. The video shows him, shows
> basically the top of his shoulder. It appears as though he's not wearing a

shirt. It's not very will lit. It's not immediately evident that he's in a jail cell. You can't see bars or other inmates or anything like that. For all we know he could be sitting in a bedroom somewhere. So I don't think it's prejudicial from that perspective. I will allow that portion of the video to be played.

Relative to the telephone call in which Defendant discussed Mr. Hoover's new gun with an unidentified woman, the trial court found,

[W]hen you boil it down, I think what the substantive portions of this phone call demonstrate, number one, is the defendant admitting his past possession of a firearm? That is relevant in a homicide case.

It could indicate if the jury views it this way, that the defendant had secreted this evidence away with a trusted friend. That is something else that would be relevant if someone was hiding evidence following a homicide, demonstrate consciousness of guilt.

So I think it is relevant for those reasons. Now, again, I don't think the whole call is relevant. And as I listened to it, I think it needs to start at the sentence, "He got a new gun yesterday," referring to [Mr. Hoover].

The trial court stated that Defendant's desire to find this particular gun "could cause a juror to conclude that it had some relevance to the homicide . . . . You don't get the feeling from listening to the call that they're just talking about some random gun that has nothing to do with what they're talking about here." The trial court found that the redacted recording contained no prejudicial information.

On the first morning of trial, defense counsel noted that the defense team and the State had not had time to determine whether the jail communications could come in without disclosing to the jury that Defendant was in custody. Defense counsel noted that "there's some big concerns if that information comes before the jury as far as things like [the] presumption of innocence and things like that[.]" The trial court stated that the parties could address the issue when it came up at trial.

Defense counsel sought to renew the objection on the record because "it will be obvious that he has been in custody during this period of time, and it's probably something we should have to address in voir dire." The trial court noted that "the objection was based upon relevancy" and that "anything regarding the fact that he was in custody when the jail calls were made, that is really outside the scope of the original motion." Defense counsel asserted that it had been raised in the prior hearing and stated that "it's inescapable and prejudicial" that Defendant was in custody at the time the calls were made.

The State noted that, if the defense were willing to stipulate to the authenticity of the communications, they could avoid "introducing excessive information about [Defendant's] being in custody or redacting portions of the written messages that make it clear that he's in custody."

The trial court found that it had considered Defendant's "403 concerns" in its previous ruling, that a juror would not be shocked to learn that a defendant charged with first degree murder had "spent some time" in pretrial detention, and that Defendant would be "dressed-out" for trial. The court concluded that "the prejudicial concerns under these circumstances are very minimal."

During trial at a jury-out hearing, the parties discussed the telephone call recording again. Defendant stated that he had agreed to stipulate that he was referring to Mr. Hoover in the call. He asserted that the recording was irrelevant and confusing to the jury.

The trial court stated that the recording's having multiple possible inferences did not mean it was confusing or misleading. The trial court found that the call was "extremely probative" because it showed that Defendant knew Mr. Hoover had a gun. The court further found that the recording provided context for Defendant's trying to determine where the gun was and procure it for testing. The court noted that the recording contained no reference to an amorous relationship between the caller and Defendant, which greatly lessened the potential prejudicial effect. The court concluded that the probative value of the recording was not outweighed by its prejudicial effect.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (first citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); and then citing *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 states that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Our Rules of Evidence provide that relevant evidence is generally admissible while irrelevant evidence is not." *State v. Kiser*, 284 S.W.3d 227, 262 (Tenn. 2009); s*ee* Tenn. R. Evid. 402. However, even if the evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

As a preliminary matter, on appeal, Defendant argues that his case involves the constitutional question of whether the jury's seeing evidence of his having been in pretrial custody "create[d] a subtle prejudice undermining the presumption of innocence," like cases in which a defendant is forced to appear at trial in jail garb. *See, e.g.*, *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976). At the discussion on the first day of trial, the trial court noted that it had considered Defendant's being in custody as part of Defendant's argument that the evidence was unfairly prejudicial pursuant to Tennessee Rule of Evidence 403, not as a freestanding constitutional claim. Although defense counsel briefly argued that Defendant had raised the issue of the pretrial confinement in the previous hearing, the trial court made no findings on the constitutional issue and continued to analyze it as an evidentiary issue, and defense counsel did not request further findings on the matter. Likewise, in the motion for new trial and at the corresponding hearing, Defendant framed the issue as evidentiary, not constitutional. As a result, Defendant's constitutional argument was waived for failure to clarify the basis for his issue on the first day of trial and raise it in the motion for new trial. *See State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal.") (citation omitted). However, his argument bears on the prejudicial effect of the complained-of evidence, and we will consider it in the limited context of the evidentiary question preserved for appeal.

Defendant draws our attention to *State v. Wilson*, No. W2014-01054-CCA-R3-CD, 2015 WL 8555599, at *18 (Tenn. Crim. App. Dec. 11, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016), in which this court concluded that a mistrial was not merited when the prosecutor asked a witness questions in a manner that revealed the co-defendants were in jail pending trial. This court noted,

> [W]hile the State erred by mentioning [the] incarceration, all three defendants were on trial for first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony; therefore, given the severity of appellant's offenses, logic dictates that the jury "must know a person on trial is either on bail or in confinement during the course of a trial." *State v. Baker*, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). Furthermore, "[t]his court has held that a prosecutor's brief reference regarding a defendant's incarceration 'hardly compares to a

defendant's appearing in shackles before the jury.'" *State v. Corso,* No. M2010-00782-CCA-R3-CD, 2011 WL 2848270, at *20 (Tenn. Crim. App. July 19, 2011) (citation omitted).

*Id.* In short, this court has previously concluded that brief references to pretrial detention, especially in cases involving serious offenses, do not rise to the level of prejudice inherent in appearing in shackles or prison garb in front of the jury.

With that framework in mind, we cannot conclude that the trial court abused its discretion by finding that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice resulting from the jury's being made aware that Defendant was in jail while awaiting trial. The references were limited to Lieutenant Ayers' very brief testimony authenticating the evidence at the end of the five-day trial. The jury had heard Defendant's repeated pleas to be arrested during his fourth police interview and saw him handcuffed at the conclusion of that interview; in addition, confinement pending trial for a first degree murder charge should not have been shocking to the jury. *See id.* The telephone recording and video chat did not contain background noise specific to a jail or depict any features of the inside of the jail, and Defendant was not wearing a prison jumpsuit in the video. The record reflects that Defendant was "dressed out" for trial. Further, the State had a legitimate purpose for having Lieutenant Ayers testify—it needed to authenticate the jail-based evidence. The trial court found that the probative value of the communications was to document Defendant's acknowledgment of his involvement in the killing and that Defendant was trying to seek out a particular gun, impliedly one relevant to the killing, that could have been given to Mr. Hoover. Under these circumstances, the trial court did not abuse its discretion by admitting the communications, as redacted. We note that the jury was properly instructed on the presumption of innocence and that the jury is presumed to follow the trial court's instructions. *See Banks*, 217 S.W.3d at 137.

In addition, we note that the State offered twice on the record to stipulate to the authenticity of the exhibits, but Defendant did not agree to the stipulation. Defendant did not, at any point, dispute the proposed exhibits' authenticity and could have agreed to the stipulation, thereby removing the need for Lieutenant Ayers to draw attention to her role and the context in which the messages and calls were created. As a result, Defendant "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error," and he is not entitled to relief. Tenn. R. App. P. 36(a).

### C. Closing Argument

Defendant contends that the prosecutor committed misconduct during closing arguments by stating that (1) Defendant had instructed Mr. Hoover to call the victim as a part of his cover-up, which was contrary to the testimony; (2) Defendant had stamped out

the cigarette butt found underneath the victim's hair as he resolved to retrieve his gun and kill her and that Defendant would have been calm after smoking; and (3) Defendant concealed the gun from the victim based upon his question to Lieutenant Sanders about whether he wanted to know where he had "hid" the gun. The State responds that the misstatement about Mr. Hoover's calls to the victim was unintentional, that the remaining statements were within the bounds of permissible argument, and that Defendant was not prejudiced by any error in closing arguments.

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *Banks*, 271 S.W.3d at 130), *overruled on other grounds by State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022). Because counsel in criminal cases are "expected to be zealous advocates," they are afforded "great latitude in both the style and the substance of their arguments." *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). "Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted).

Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the

[c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6. A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001).

### 1. Misstatement that Defendant instructed Mr. Hoover to call the victim

During the State's closing, the prosecutor argued that Defendant "set the gears in motion to attempt to cover-up a first degree murder," including setting a "track record" of calling and messaging the victim after her death in order to insulate and separate himself from the murder. The prosecutor stated that, after Mr. Hoover picked up Defendant, "They stopped the vehicle again at Party City and then Mr. Hoover was instructed to call [the victim] by [D]efendant, again trying to –[.]" Defense counsel objected that the prosecutor had misstated the evidence; during a bench conference, it became apparent that the prosecutor was recalling information Mr. Hoover had told them in a meeting, although it was not what his trial testimony reflected. The prosecutor stated to the trial court, "I'm certainly not trying to inject things that aren't in the record." The trial court responded, "No, I understand. All right. Thank you all." The prosecutor continued his argument without correcting himself; defense counsel did not request any sort of curative instruction, and the trial court did not issue any such instruction to the jury.

The record reflects that, per the prosecutor's statements during the bench conference, his misstatement was unintentional and the result of confusing Mr. Hoover's statements at trial and his statements to the prosecutors at a private meeting. Although the trial court did not offer to issue a curative instruction, and the prosecutor did not attempt to correct himself to the jury, the prosecutor moved on and did not reference the statement again. We note that the jury was instructed that the statements and arguments of counsel were not evidence and that any statements of counsel that were not supported by the evidence should be disregarded. The jury is presumed to follow the trial court's instructions. *See Banks*, 217 S.W.3d at 137. Mr. Hoover stated multiple times during his testimony that he offered to call the victim because Defendant was upset and he wanted to help, not because Defendant asked him to do so. We cannot conclude that the erroneous statement affected the verdict to Defendant's prejudice.

## 2. Comments on calmness from smoking

In the State's rebuttal, the prosecutor emphasized that, even assuming the victim died immediately after sending her last text message at 12:39 a.m., Defendant had about forty-five minutes between the time he called Mr. Hoover to pick him up and the shooting. The prosecutor averred that, if the cigarette butt under the victim's hair had been there for very long, it would have been kicked away from the location in which it landed as the victim packed and moved her belongings to her car. The prosecutor stated that its presence "indicates that that's the last cigarette [Defendant] was smoking while he's sitting and thinking about what he's going to do. Then he has the wherewithal to put it out, stomp it out, get a gun and shoot her." The prosecutor continued, "Think about it . . . . The most calm a smoker is ever going to be is after they've just gotten a nicotine fix, after they've had their cigarette." Defendant failed to lodge a contemporaneous objection to these statements and did not raise this issue in the motion for new trial or at the motion for new trial hearing. He requests plain error relief.

The Tennessee Supreme Court has previously stated that "[i]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" explaining that a timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). A defendant's failure to object contemporaneously will constitute a waiver of the issue on appeal. *Id.* at 58 (citing Tenn. R. App. P. 36(a)). "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *Enix*, 653 S.W.3d at 700-01.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

We do not think plain error relief is required here. Although the prosecutor's statements toed the line between reasonable inferences from the evidence (the cigarette butt's having landed on the floor close to the time of the victim's death based upon the ash's being relatively undisturbed) and speculation (that Defendant dropped the cigarette and put it out after having decided to kill the victim) or facts not established in the record and arguably beyond common knowledge (the effect of nicotine on a heavy smoker), it is not evident from the record that defense counsel did not waive the issue for tactical reasons. Defense counsel had already lodged one objection during the State's closing when the prosecutor misstated the evidence, and she noted that her general practice was not to interrupt closing arguments. Although Defendant argues that no tactical reason existed not to object, defense counsel demonstrated that she had the ability and judgment to decide when a statement was sufficiently egregious to merit the interruption and risk of drawing the jury's attention to the statement. Defendant is not entitled to plain error relief.

### 3. Assertion that Defendant hid the gun from the victim

In rebuttal, the prosecutor quoted Defendant's asking in his fourth police interview if Lieutenant Sanders had asked "where [Defendant] hid" his pistol, after Lieutenant Sanders asked where he kept the gun in the house. The prosecutor asserted that Defendant was referring to concealing the gun from the victim after he retrieved it so that she did not know to protect herself. The prosecutor noted that the victim was facing away from Defendant and had her arms full of clothing when he shot her. Again, although Defendant raised no objection to the statement contemporaneously or in the motion for new trial, he requests plain error relief.

We do not think plain error relief is required here because, again, Defendant has not shown that defense counsel did not waive the issue for tactical reasons. The jury was instructed that the arguments of counsel were not evidence, and it could evaluate whether the prosecutor's inferences were reasonable. Defense counsel had already objected to the prosecutor's closing once and was in the best position to evaluate the risks and benefits of interrupting rebuttal argument.

Defendant has also not shown that a clear and unequivocal rule of law was not breached. The victim's being unaware that she was about to be shot was a reasonable inference from the evidence presented—her arms were full of clothes, she was heading to the garage, no evidence existed of a struggle in the house or otherwise suggested that the victim was fleeing Defendant, she was killed by a single gunshot to the back of her head, and the lack of stippling and soot suggested that the shot was fired from some distance. It was not beyond the scope of reasonable argument to extrapolate that Defendant's subtlety in retrieving the gun and preparing to fire was intentional.

Relative to Defendant's assertion that the prosecutor misrepresented the meaning of his clarifying question, we note that the prosecutor played portions of Defendant's police interview during its closing, including when Defendant stated that he "pulled out a pistol" and shot the victim. The jury heard the full context of the exchange between Defendant and Lieutenant Sanders and was able to evaluate the prosecutor's argument accordingly. Because Defendant has not established all of the plain error factors, Defendant is not entitled to plain error relief.

### D. Jury Instructions

Defendant contends that the trial court erred by declining to instruct the jury on voluntary manslaughter as a lesser-included offense, arguing that the proof fairly raised the issue of whether Defendant was in a state of passion produced by adequate provocation. The State responds that the trial court properly determined that no adequate provocation was suggested by the evidence.

Defendant also contends that the trial court erred by issuing the pattern jury instruction relative to the destruction of evidence, arguing that the instruction implies that destruction of evidence may support an inference of guilt only as to the charged offense, rather than to a lesser-included offense. The State responds that the jury was properly instructed.

"It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and that the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court." *State v. Green*, 995 S.W.2d 591, 604-05 (Tenn. Crim. App. 1998) (citations omitted). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). "The omission of an essential element from the jury charge is subject to harmless error analysis." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010) (citing *State v. Garrison*, 40 S.W.3d 426, 434 (Tenn. 2000)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *Id*. (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)).

## 1. Jury Instruction Conferences

After the close of the State's evidence, the jury was excused, and the trial court discussed the jury instructions with the parties; the court noted that it wanted Defendant to consider the instructions on lesser-included offenses before making a decision about whether to testify. Defendant requested that the jury be instructed on second degree murder and voluntary manslaughter. The State agreed that second degree murder was fairly raised by the proof but argued that no proof of adequate provocation existed to support a conviction for voluntary manslaughter.

The trial court stated that Defendant had not referred to any evidence of provocation, noting that case law required that "violent provocation" had to come from the victim. When asked to specify the evidence of the victim's provoking Defendant, Defendant argued that "the dots can be connected and that can be deduced" from the record. Defendant stated that the victim was intoxicated, which "expands the personality. That she had the type of personality where she loved hard and fought hard and knew how to shut you down in an argument. That they were engaged in an argument, and the timeline shows that something happened suddenly." Defendant averred that the evidence, "construed liberally" in his favor, contained proof of a state of passion.

The trial court discussed case law and stated that, generally, words alone cannot serve as adequate provocation for voluntary manslaughter. The trial court noted that most cases required words and a physical provocation or a trespass. The trial court found that Defendant had said that he and the victim were having a "spat" over the issue of leaving the bar. The trial court noted that Defendant sometimes "downplayed it to the point of it wasn't words like she was leaving." The trial court found that no evidence was presented that the victim used any offensive words toward Defendant and that, when Defendant told the victim he was leaving, she told him, "Have fun." The trial court concluded, "The mere circumstance that a girlfriend is leaving a boyfriend in and of itself is not an act of provocation . . . . That is an act of someone removing themselves from the situation. Not provoking a situation in a way that would mitigate an intentional or knowing killing." The trial court found that, if the jury convicted Defendant of voluntary manslaughter, the evidence would be insufficient to support it. The trial court stated that, pending any evidence Defendant decided to present, it would not instruct the jury on voluntary manslaughter.

The following day, the trial court continued the jury instruction conference. The State requested an instruction on the destruction of evidence relative to Defendant's pistol. The State argued that it was fairly raised because the gun was never recovered; Defendant told the police that he left the gun with Mr. Hoover, and Mr. Hoover testified that Defendant brought the gun with him, asked Mr. Hoover to stop at a bridge so that he could throw it away, and took it with him. Defendant objected to the instruction, arguing that it

was ambiguous "for an offense which requires such a heightened level of mens rea and requires the State to disprove certain states of mind." Defendant stated that "[c]ertainly destroying a gun does not justify an inference of guilt for first degree murder, and so we think that that is too tenuous and confusing and could lead the jury to [a] . . . finding that isn't supported by the evidence." The trial court granted the State's request, finding that the instruction was fairly raised by the proof.

Defendant argued again that voluntary manslaughter should be instructed as a lesser-included offense, asserting that adequate provocation "simply means that one was not calm enough for deliberation." Defendant discussed cases from other states in which words alone were held to constitute adequate provocation and argued that the victim's words alone constituted a sudden "betrayal" sufficient to cause a reasonable person to enter a state of passion, given that he had left his family life behind very recently to be with her. Defendant also argued that the victim's words and her actions of packing up and beginning to leave constituted adequate provocation. Defendant noted that a state of passion was a defense to second degree murder that the State had to disprove in order to demonstrate the requisite mental state. Defendant requested a supplemental instruction that it was the State's burden to prove that Defendant was not in a state of passion in order to find him guilty of first degree murder.

The State responded that cases in which words alone established adequate provocation involved the "revelation of some sort of offense or trespass that's already happened against somebody that learning this information would cause them to go into a fit of passion or excitement." The State averred that no such revelation was made in this case. Defendant responded that adequate provocation did not require that the victim did anything wrong, only that the victim's words or actions would provoke a reasonable person.

The trial court noted that Defendant had submitted a written request for the voluntary manslaughter instruction. The trial court stated that case law on the topic had strengthened the court's reasoning that the victim did not provoke Defendant. The trial court noted that the cases cited by Defendant were factually distinguishable and found that no evidence had been presented of words or actions by the victim to provoke Defendant. The court stated, "I don't think that law would recognize a situation where every time a boyfriend or girlfriend leaves their significant other, they're creating a situation that would potentially mitigate an intentional or knowing killing of that person."

## 2. Voluntary Manslaughter

Defendant argues that the "unusual circumstances of this case" raised the possibility that he was in a state of passion produced by adequate provocation. Specifically, he asserts that the following facts could cause a reasonable person to act in an irrational manner:

Defendant had upended his life very recently to be with the victim, and she was possibly leaving him; the victim had indicated that she "may have met another man at the bar"; Defendant had described the incident as a "sudden quarrel" in his jail communications; Defendant told Mr. Jack that the victim was "way too offensive real quick for no reason with [him]"; and Defendant had told the non-emergency dispatcher that the victim went "crazy" during their argument.

A defendant has a constitutional right to instructions on lesser-included offenses if warranted by the proof. *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016). Whether the trial court should have instructed the jury on a lesser-included offense is a mixed question of law and fact, which we review de novo with no presumption of correctness. *Banks*, 271 S.W.3d at 124 (first citing *State v. Hatfield*, 130 S.W.3d 40, 41 (Tenn. 2004); then citing *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004)). When addressing issues related to failure to charge lesser-included offenses, appellate courts consider three questions: "(1) whether the offense is a lesser[-]included offense; (2) whether the evidence supports a lesser[-]included offense instruction; and (3) whether the failure to give the instruction is harmless error." *Id.* (citing *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002)).

Pursuant to Tennessee Code Annotated section 40-18-110(g)(2), voluntary manslaughter is a lesser-included offense of premeditated first degree murder. If "a lesser offense is included in the charged offense, the question remains whether the evidence justifies a jury instruction on such lesser offense." *State v. Burns*, 6 S.W.3d 453, 467 (Tenn. 1999). Tennessee Code Annotated section 40-18-110(a) provides:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser[-]included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser[-]included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser[-]included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser[-]included offense.

In this case, the trial court found that, in the light most favorable to the existence of voluntary manslaughter, the evidence was legally insufficient to support the existence of adequate provocation because the limited evidence of what occurred during the argument did not include any provoking language directed at Defendant, and the victim's actions consisted of trying to remove herself from the situation.

- 65 -

Relative to the victim's supposed assertion that she met another man at Bullfeathers, Defendant himself stated multiple times that he was unbothered by it, that he was not the "jealous type," that he knew what he had gotten himself into, and that the victim was trying to make him jealous. Defendant's statements minimizing any true threat to his relationship are supported by the Bullfeathers surveillance recording, which showed the victim's frequently attending to Defendant and being physically affectionate with him, as well as the fact that she lacked any consistent male companions apart from Defendant.

Relative to the victim's behavior during the argument, Defendant consistently and repeatedly asserted that the dispute was verbal in nature and that he never laid hands on her, which was consistent with the house's being undamaged and the lack of any sign of a struggle on Defendant's and the victim's bodies. Defendant stated once at the end of his fourth police interview that the victim had said that she was leaving. We agree with the trial court that, under the circumstances of this case, the evidence would have been insufficient to support a conviction for voluntary manslaughter; as a result, the court's decision not to instruct the jury on voluntary manslaughter as a lesser-included offense was proper.

In addition, as Defendant acknowledges, the jury unanimously convicted Defendant of first degree murder, which involved finding that the evidence of premeditation was sufficient beyond a reasonable doubt. The jury was instructed to consider his guilt of the charged offense first before proceeding to lesser-included offenses. As a result, any error in the trial court's declining to instruct the jury on voluntary manslaughter as a lesser-included offense was harmless. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998).[9]

### 3. Destruction of Evidence

Defendant argues that, "while the destruction of evidence here was evidence that [he] committed a crime, it was not especially probative of which *particular degree of homicide* had been committed." As a result, he asserts that the statement in the destruction of evidence instruction that it could support "an inference of guilt . . . implied that this evidence tended to establish . . . the charged crime . . . and not another degree of homicide," thus misleading the jury. The State responds that the instruction was not misleading.

In this case, the trial court issued the pattern jury instruction on concealment or destruction of evidence. *See* T.P.I. – Crim. § 42.27. The jury was instructed as follows:

---

[9] As an alternative argument, Defendant submits that *Williams* was wrongly decided "given that, in determining homicide, the jury must consider multiple levels of offenses simultaneously." Although it is not the province of this court to overturn established precedent, we make note of Defendant's argument in the event of further review by our supreme court.

Any attempt by a person to conceal or destroy evidence is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. While that inference is by no means strong enough of itself to warrant conviction, yet it may become one of a series of circumstances from which guilt may be logically inferred.

Whether the evidence presented proves beyond a reasonable doubt that the defendant so acted is a question for your determination. If this fact is proven, this fact alone does not allow you to find that the defendant is guilty of the crime alleged.

However, since an attempt by a defendant to conceal or destroy evidence may be caused by a consciousness of guilt, you may consider this fact, if it is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, a person entirely innocent of a particular crime may attempt to conceal or destroy evidence and this may be explained by the proof offered, or by the facts and circumstances of the case.

Concealment or destruction of evidence of a crime is not proof of premeditation.

Whether there was any attempt to conceal or destroy evidence by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

In addition, the trial court issued the pattern jury instruction regarding inferences. *See* T.P.I. – Crim. § 42.19. The jury was instructed as follows:

The Court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all of the evidence in the case warrant the inference which the law permits the jury to draw.

The evidence may be rebutted by direct or circumstantial evidence, whether it exists in the evidence of—offered by the State or offered by the defendant. Although the defendant is not required by law to do so, when the defendant offers an explanation to rebut the inference raised, you should consider such explanation along with all the evidence to determine not only the correctness of the inference, but also the reasonableness of the defendant's explanation.

You are not bound to accept either the inference or the defendant's explanation. The State must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

We agree with the State that the instruction is not misleading and that the trial court's instructions as a whole "fairly submitted the legal issues and informed the jury of the applicable law." *State v. Le Hurst*, No. M2010-01870-CCA-R3-CD, 2012 WL 6673119, at *28 (Tenn. Crim. App. Dec. 20, 2012) (rejecting defendant's claim that a similar instruction, which did not include that destruction of evidence was not proof of premeditation, was misleading because it did not clearly state that the inference of guilt extended to lesser-included offenses of first degree murder), *perm. app. denied* (Tenn. May 9, 2013). Defendant acknowledges that the destruction of evidence instruction was fairly raised by the proof that he disposed of the gun used to shoot the victim. In addition to stating that the destruction of evidence *may* justify an inference of guilt, the instruction included that a person who destroys evidence may be innocent, that the jurors were not required to infer guilt, and that destruction of evidence is not proof of premeditation. The jury was also instructed that it was not required to make any inferences and that the State was required to prove every element of the offense beyond a reasonable doubt. *See State v. Moss*, No. M2014-00746-CCA-R3-CD, 2016 WL 5253209, at *27 (Tenn. Crim. App. Sept. 21, 2016) (concluding that the trial court properly issued the pattern jury instructions on concealment of evidence, which instructed jurors that whether the defendant concealed evidence was a question for their determination to be considered with all the other evidence; in addition, the general instruction on inferences informed the jury that it was not required to make the inference and rearticulated the State's burden of proof), *perm. app. denied* (Tenn. Jan. 19, 2017). Defendant is not entitled to relief on this basis.

### E. Cumulative Error

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation but that "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In other words, only where there are multiple deficiencies does this court determine whether they were cumulatively prejudicial. In this case, we have not identified multiple errors; therefore, no cumulative error exists.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE